BLANCHARD (JOLLY v.). See Case No. 7,-438.

## Case No. 1,513.

### BLANCHARD et al. v. The MARTHA WASHINGTON.

[1 Cliff. 463;[1] 25 Law Rep. 22.]

Circuit Court, D. Maine.    Sept. Term, 1860.

SHIPPING—PUBLIC REGULATIONS—CONVEYANCE OF VESSEL—PLACE OF REGISTRY — REGISTRY ACT JULY 29, 1850—CONSTITUTIONALITY.

1. By the act of December 31, 1792 [1 Stat. 287], the permanent register of every American vessel must issue from and be recorded in the office of the collector of the home port, which by law is defined to be the port at or nearest to which the owner, if there be but one, or if more than one, the husband, or acting, or managing owner, usually resides.

[Cited in Morgan v. Parham, 16 Wall. (83 U. S.) 475; The Jennie B. Gilkey, 19 Fed. 129; The Samuel Marshall, 49 Fed. 760.]

2. The office of the collector at the home port is the proper place for the registry of a bill of sale, mortgage, hypothecation, or conveyance of a vessel, within the meaning of the act to provide for recording the conveyances of vessels and for other purposes.

[See The John T. Moore, Case No. 7,430.]

3. The provisions of the act of congress of July 29, 1850 [9 Stat. 440, c. 27, § 1], concerning the registry of vessels, is constitutional and valid.

[Cited in White's Bank v. Smith, 7 Wall. (74 U. S.) 656; In re Scott, Case No. 12,517.]

[4. Cited in Thurber v. The Fanny, Case No. 14,014, to the point that admiralty has jurisdiction of petitory as well as possessory actions, and has often been called upon to adjudicate on the title to ships.]

[5. Distinguished in Britton v. The Venture, 21 Fed. 928, from cases alleged to hold that a mortgage of vessel to secure purchase money is a maritime contract, under which a court of ad-

miralty will either decree a foreclosure or enforce the mortgagee's right of possession.]

[Appeal from the district court of the United States for the district of Maine.]

This was an admiralty appeal. The libel [by Alfred Blanchard and others] was filed to try the title to one-fourth part of the brig Martha Washington. Answers were made by William Anderson as master and part owner, by Phebe J. Flood, Amos D. Dolliver, George H. Coggins, Jacob Anderson, and Ferdinand McFarland. The libellants claimed to own five eighths of the brig; but according to the answers they owned but six sixteenths at the time of filing the libel; and the rest was owned as follows: three sixteenths by Phebe J. Flood, two sixteenths by Joseph H. Perley, one sixteenth by William Anderson, one sixteenth by George H. Coggins, one sixteenth by Jacob Anderson, one sixteenth by Ferdinand McFarland, and one sixteenth by Amos Dolliver. Libellants contested the four sixteenths claimed by Flood and Dolliver, but the district court entered a decree for respondents. The case was submitted in the court upon an agreed statement of facts as follows: It is admitted that the brig was built at Surrey, in the collection district of Frenchman's bay, state and district of Maine, in the year 1853; that at that time, and on the 5th of December, 1853, the majority in interest of the owners resided in Trenton and Surrey, within said collection district; that on that day she was permanently registered at the custom-house in said district; that on the 25th of October, 1855, the majority in interest of the owners still resided as aforesaid; that on that day her register was surrendered, and she was permanently enrolled in said custom-house, enrolment No. 60; that at that time the libellants were owners of two tenths; William Coggins, then living at Surrey, since deceased, owned one half, William Anderson three sixteenths, and George H. Coggins, Jacob Anderson, and Ferdinand McFarland, one sixteenth each, of said brig; that on the 7th of December, 1855, the said brig being at Norfolk, and no one of the owners, except the said William Anderson, her master, being there, he being the owner, at that time, of three sixteenths, and desiring to proceed on a voyage to the West Indies, she was temporarily registered in the town of Norfolk, within and for the collection district of Norfolk and Portsmouth, as appears by the copy of the register, which makes part of the case; and said brig continued to sail under said register during the whole of the year 1856, and most of the year 1857; that on the 27th of March, 1856, the said William Coggins, then living, and a resident of Surrey, aforesaid, conveyed to the said Phebe J. Flood, by mortgage bill of sale, three sixteenths of said brig, which bill of sale was, on the 1st of April, 1856, recorded at the custom-house at Ellsworth, in the collection district of Frenchman's bay; that on or about

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

the 1st of September, 1856, the said Coggins conveyed to the said Amos D. Dolliver, by mortgage bill of sale, one-sixteenth part of said brig, which bill of sale was, on the 2d of said September, duly recorded at the custom-house at Ellsworth, in the collection district of Frenchman's bay; that on the 21st of November, 1856, the said William Coggins, then a resident of Surrey, where he continued to reside till his death, conveyed to the libellants, by mortgage bill of sale, four-eighths parts of said brig, which bill of sale was duly recorded on the 27th of the same November, at Ellsworth, in the collection district of Frenchman's bay; also, on the 11th of May, 1857, at Norfolk, in the collection district of Norfolk and Portsmouth; also, on the 18th of November, 1857, by the clerk of the town of Surrey, in the records of mortgages of that town, but after the decease of said Coggins.

All the mortgages, enrolments, and registers make a part of the case, but need not be copied. It is agreed that none of the mortgages have been paid, and that they had all become fully foreclosed at the time of filing the libel, so as to vest the title absolutely in the several mortgagees; also, that the two mortgages to the said Phebe J. Flood and Amos D. Dolliver were never recorded by the town clerk of Surrey, in the records of mortgages of that town. Failing to show that the libellants had actual notice of the transfer, as was alleged in the answer, the claimants insisted that the libellants had constructive notice of the same; because, they insisted, the bills of sale to them were duly and properly recorded at the custom-house in the district comprehending the port to which the vessel belonged. To this the libellants replied, first, that the custom-house at Norfolk, in the state of Virginia, and not the one at Ellsworth, was the proper place for recording the respective bills of sale, and inasmuch as the claimants' bills of sale were not recorded at Norfolk, the registry was a nullity and inoperative as a constructive notice of the conveyance; second, that the act of congress of July 29, 1850 (9 Stat. 440), is unconstitutional and void, and that their title to the four sixteenths was valid, because their bill of sale was duly recorded, pursuant to the state law, in the office of the town clerk where the mortgagor resided when the instrument was executed.

Fessenden & Butler, for libellants.
Shepley & Dana, for Dolliver and Flood.

CLIFFORD, Circuit Justice. In considering the first question, which is purely one of construction, it must be assumed that the act of congress under consideration is valid and obligatory. Referring to the first section of the act [9 Stat. 440] it will be seen that it provides that no bill of sale, mortgage, hypothecation, or conveyance of any vessel of the United States shall be valid against any person other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof, unless such bill of sale, mortgage, hypothecation, or conveyance be recorded in the office of the collector of the customs where such vessel is registered or enrolled. Relying upon the closing paragraph of the section, the libellants insist that the respective mortgages of the claimants were not duly recorded according to that provision; that the proper office for registering the same was that of the collector of Norfolk, from which the temporary register of the vessel issued, and not that of the collector at Frenchman's bay, where the vessel was built, originally registered, and permanently enrolled. On the other hand, the claimants insist that by the true construction of the provision, the registry of every such transfer must always be made at the custom-house of the home port of the vessel where the permanent register or enrolment was obtained. Ships or vessels are required to be registered by the collector of the district in which shall be comprehended the port to which the same shall belong at the time of the registry, which port shall be deemed to be that at or nearest to which the owner, if there be but one, or if more than one, the husband or acting and managing owner usually resides. [Act Dec. 31, 1792] 1 Stat. 288 [section 3]. Permanent registry, therefore, as manifestly appears by that provision, is required to be made at the home port of the vessel, and what is meant by the home port is clearly and plainly defined. That requirement is also accompanied by another, which it becomes important to notice in this connection, and which is scarcely less significant than the one just recited. Registry must be made at the home port; and the same section provides that the name of the ship or vessel, and of the port to which "she shall so belong," shall be painted on her stern, on a black ground, in white letters of not less than three inches in length; and the owner or owners are made liable to a penalty of fifty dollars for neglecting to comply with that requirement. All persons interested, therefore, have the means of ascertaining the name of the vessel and her home port; and her shipping-papers, which include a copy of her register or enrolment, are by law required to furnish the same information. Matters requisite to the registering of any ship or vessel are required to be recorded, and for that purpose the collector of the district comprehending the port to which the ship or vessel belongs is required to keep in some proper book a record or registry thereof, and to grant an abstract or certificate of the same according to the form prescribed in the ninth section of the act. Other provisions also of the same act show that every ship or vessel has a home port, and that all persons interested are by law referred to that port for their permanent registers or enrolments. Citizens of the United States may become the owners of a ship or vessel entitled to be reg-

istered, while the vessel is in a district other than the one where the purchaser usually resides, and in that contingency it is provided, by the eleventh section of the act, that such ship or vessel shall be entitled to be registered by the collector of the district where she may be at the time of the conveyance; but in that event it is provided that whenever such ship or vessel shall arrive within the district comprehending the port to which she "shall belong," the certificate of registry which shall have been obtained as aforesaid shall be delivered up to the collector of such district, who, upon the requisitions of this act, in order to the registry of ships or vessels being duly complied with, shall grant a new one in lieu of the first, and the certificate so delivered up shall forthwith be returned by the collector who shall receive the same to the collector who shall have granted it. These references to the act of the 31st of December, 1792 [1 Stat. 287], are believed to be amply sufficient to show that every ship or vessel of the United States has a home port, and that her permanent register must issue from, and be recorded in, the office of the collector of such home port, which by law is defined to be the port at or nearest to which the owner, if there be but one, or if more than one, the husband or acting and managing owner, usually resides. Regulations to the same effect are prescribed by the act of the 18th of February, 1793, for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries. 1 Stat. 305. By the first section of that act it is provided in effect that, in order for the enrolment of any ship or vessel, she must possess the same qualifications as are made necessary for registering the same, and the same requisites must in all respects be complied with as on application for a register. Every licensed ship or vessel also is required to have her name and the port to which she belongs painted on her stern, in the manner as is provided for registered ships or vessels; and if any licensed ship or vessel be found without such painting, the owner or owners thereof are made liable to a fine of twenty dollars. Section 11, p. 309. Collectors of the several districts are authorized by the third section of the act to enroll and license any ship or vessel that may be registered, upon such registry being given up, or to register any ship or vessel that may be enrolled, upon such enrolment and license being given up as therein required. Undoubtedly these reciprocal changes may be made upon the application of the master or commander, when the ship or vessel is in a district other than the one to which she belongs; but in every such case, the master or commander is required to make oath that, according to his best knowledge and belief, the property of the vessel remains as expressed in the register or enrolment proposed to be given up. Whenever such exchanges are made, it becomes the duty of the collector making the same to transmit the register or enrolment given up to him to the register of the treasury; and the same section provides that the one granted in lieu of the one given up shall within ten days after the arrival of such ship or vessel within the district to which she belongs be delivered to the collector of said district, and be by him cancelled; and the master or commander is made liable to a penalty of one hundred dollars if he shall neglect to deliver the register or enrolment and license as therein required. Registers or enrolments granted under that provision are temporary in their operation, and consequently are so denominated as contradistinguished from those granted at the office of the collector of the district where the ship or vessel belongs. Change of ownership, where the new owners reside in a district other than the one in which the former owners resided, or a majority in interest of the vessel, will authorize a corresponding change of the home port, and of the permanent register or enrolment; but in that case, if the ship or vessel has undergone no alteration in burden since her last registry, it will not be necessary to produce the certificate of a master carpenter, or the surveyor's certificate of admeasurement. When application for the new certificate of registry is made, the former certificate must be surrendered to the collector to whom the application for such new registry is made, and be by him transmitted to the register of the treasury for cancellation; and it is expressly required that the new certificate of registry shall refer to the prior certificate for the admeasurement of such ship or vessel. 1 Stat. § 14, p. 294; Reg. Rev. Laws, pp. 17, 18; 1 Stat. p. 498. Corresponding change, of course, must be made in the name of the port to which the ship or vessel belongs, as painted on the stern of the vessel; but the name of the vessel cannot be changed, under existing laws, without an act of congress. [Act Jan. 17, 1859] 11 Stat. p. 375. Reference is made to these provisions as showing that ships or vessels once documented as vessels of the United States never cease to have a home port while they retain their character as American vessels. Whether sailing under the permanent register, issued from the office of the collector of the home port, or under a temporary document issued from the office of the collector of some other district in the course of the voyage, every such ship or vessel bears upon her stern the name of the port to which she belongs; and although sailing under such temporary document, still it recites the name of her home port, and expressly refers to the permanent register or enrolment, reciting all the material facts upon which the latter was founded. Permanent registers are very properly defined in the treasury regulations as being those granted by collectors to ships and vessels belonging to ports within their respective districts; and, by the same authority, temporary registers are defined to be those granted by collectors

to ships and vessels belonging to ports in other districts. Practically, the one is distinguished from the other by the word "permanent" or "temporary," according to the fact, being written on the margin of the document immediately above the number, but they may also be readily distinguished by their material recitals; the former is founded either upon the certificate of the master carpenter, and that of the surveyor, or upon the representation of a change in the ownership of the vessel, and in the residence of the owners; while the latter is uniformly founded upon the former certificate and the suppletory oath of the master or commander, certifying, among other things, that the vessel is bound on a voyage which necessarily calls for a change of the documents. Such temporary certificates always give the name of the vessel and the name of the port to which she belongs, and clearly they are, in contemplation of law, but temporary substitutes for the permanent documents. No better illustration of the proceeding can be found than is furnished by the papers in this case. Desiring to change the employment of the vessel and go on a foreign voyage, the master made and filed in the office of the collector for the district of Norfolk and Portsmouth the requisite oath to enable him without returning to the home port of the vessel to obtain a register in lieu of the enrolment under which she was sailing at the time of the application. Accordingly he made and subscribed an oath, stating the names of the owners, the proportion owned by each, the name of the place where and the time when she was built, the port to which she belonged, and that she was bound on a foreign voyage, and referred to her permanent enrolment to confirm his statements. Having made oath to those facts, and given the bond required by law, the temporary register was issued by the collector, and it was clearly but a temporary substitute for the permanent enrolment which was surrendered. Documents of permanent character are granted to ships and vessels built or owned by citizens of the United States, to confer upon them the character of American vessels, and to secure to their owners the benefits and privileges belonging to vessels entitled to that designation. Temporary registers or enrolments are authorized by law in the course of the voyage at the ports of districts other than the one where the vessel belongs, as matter of convenience to the owners, to save the loss of time and the expense which must otherwise be incurred by a return of the vessel to her home port merely for the purpose of changing her papers. Permanent documents, whether registers or enrolments, are uniformly granted at the home port, but temporary ones are never granted, except when the vessel is in the port of a district other than the one to which she belongs; and hence the requirement that the former shall be recorded in some proper book to be kept by the collector granting the same. No such requirement is made in regard to the latter, but the provision is, that the collector to whom the register or enrolment and license may be given up shall transmit the same to the register of the treasury, and the register or enrolment and license granted in lieu thereof shall, within ten days after the arrival of the vessel within the district to which she belongs, be delivered to the collector of said district and be by him cancelled. Registry of bills of sale of ships or vessels surely need not be recorded in more than one office, and the unbroken practice of seventy years points to the office of the collector of the home port as the proper place for such registry, and consequently as the one contemplated by the act of congress under consideration. Every ship or vessel regularly documented is registered or enrolled at the port of the district where she belongs; and that remark is correct, although she may be sailing under a temporary register or enrolment granted at the office of the collector of some other port. Such a temporary document always refers to the permanent one, and is founded upon it, and indeed would be of no validity if the permanent one did not exist. Confirmation of this construction is derived from the language of the second section of the act. Collectors of customs are required by the second section to record the bills of sale, mortgages, hypothecations, and conveyances mentioned in the first section; and also all certificates for discharging and cancelling any such conveyance, in a book to be kept for that purpose, in the order of their reception. They are also required to note in said book, and also on the bill of sale, mortgage, hypothecation, or conveyance, the time when the same was received, and certify on the instrument of conveyance, or certificate of discharge or cancellation, the number of the book, and the page where recorded. 9 Stat. p. 440. Notice, undoubtedly, is one of the objects of these requirements, in order to prevent fraud upon subsequent purchasers or encumbrancers.

But let it be conceded that the views of the libellants are correct, and it at once becomes obvious that the requirements are substantially useless; a compliance with them would seldom or never accomplish the object for which they were enacted. Ships or vessels absent from the home port may change their papers at any other one of the hundred and fifty custom-houses established under the revenue laws of the United States. Such changes occur of course while the vessel is absent from the port of the district to which she belongs, and in many instances without the knowledge of those owning a majority in interest of the vessel. Purchasers, under such circumstances, would hardly find it practicable to make search at all the custom-houses in the United States in order to learn the state of the vessel's papers, and unless they did so the dishonest vendor, on the theory of the libellants, might

easily secure the fruits of a second sale. Congress, it is believed, could not have intended to adopt any such theory; and, in view of all the provisions of law upon the subject, I am of the opinion that the office of the collector at the home port is the proper place for the registry of any such bill of sale, mortgage, hypothecation, or conveyance, within the meaning of the act to provide for recording the conveyances of vessels, and for other purposes.

Congress, by the express words of the constitution, has power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. Able counsel maintained in Gibbons v. Ogden, 9 Wheat. [22 U. S.] 3, that the power of congress in this behalf was limited to the interchange of commodities, and that it did not comprehend navigation. Responding to the argument on that point, Marshall, C. J., said, if commerce does not include navigation, the government of the United States has no direct power over that subject, and can make no law prescribing what shall constitute American vessels, or requiring that they shall be navigated by American seamen; yet this power has been exercised with the consent of all from the commencement of the government, and has been understood by all to be a commercial regulation. All America, says the late chief justice, understands and has uniformly understood the word "commerce" to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed; and finally, he affirms that the power to regulate navigation is as expressly granted as if that term had been added to the word "commerce." But the case of Sinnot v. Davenport, 22 How. [63 U. S.] 242, is more directly in point, and perhaps ought to be considered as decisive of the question. On that occasion the court had under consideration the question, whether the law of the state of Alabama requiring owners of steamboats navigating the waters of the state to file in the probate office of the county of Mobile a statement specifying the name of the vessel, the name of the owner or owners, his or their place of residence, and the proportion owned by each, was or not constitutional; and the court unanimously held that it was not, because it was in conflict with the law of congress providing for the registering and enrolling of vessels. Speaking directly upon the question involved in the case, the court say: "Congress, therefore, has legislated upon the very subject which the state law has undertaken to regulate, and has limited its regulations in the matter to a registry at the home port." That opinion was given in 1859, more than eight years after the act of congress in question was passed. Undoubtedly the means of ascertaining the names and citizenship of the owners of ships and vessels, and of perpetuating and authenticating the evidence

thereof, are regulations of commerce within the meaning of that term, as defined by the decisions of the supreme court; and if so, then it clearly follows that the regulations of congress are paramount to those enacted by the state.

For these reasons, I am of the opinion that the act of congress under consideration is valid, and consequently that the decree of the district court must be affirmed.