## Case No. 11,892.

### The ROBERT L. LANE.

### [1 Lowell, 388.] [1]

### District Court, D. Massachusetts. 1869.

BOTTOMRY—NECESSITY—COST OF INSURANCE—COMMUNICATION TO OWNERS—COSTS.

1. When a voyage is necessarily abandoned in a foreign port, after the vessel has been repaired there, the master has power to hypothecate the ship for the purpose of getting her back to the owners.

[Cited in The George T. Kemp, Case No. 5,-341.]

2. A ship belonging to Glasgow, was thus hypothecated at Honolulu, for the only voyage which could be obtained, which was to New Bedford. It appeared that the vessel had been proceeded against in the admiralty at Honolulu, and that the master believed, and had reason to believe, that she would not sell for more than the amount of the liens upon her for repairs. Held, he had the right to hypothecate the ship, by bottomry, for a voyage to New Bedford.

3. A bottomry bond is not vitiated by the stipulation that the cost of insurance shall be included in the sum to be paid by the ship in case of her safe arrival.

[Cited in The Jennie B. Gilkey, 19 Fed. 131; Re Insurance Co. of Pennsylvania, 22 Fed. 115.]

4. The master (since deceased) had written to his owners, and the letters were not produced by either side, and were not within reach of the libellants: Held, that the master would be presumed to have made full and true communication to his owners.

5. The ship and freight being insufficient to pay the bond, costs were not given against the claimants personally, they being mortgagees out of possession, and there appearing some reason for their contesting the bond.

This large and valuable ship was built in New York, but owned in Glasgow. In September, 1867, she was lying at Acapulco, on the coast of Mexico, and Silas P. Martin, then in New York, was appointed master, and directed to go to Acapulco and take command, and thence proceed to Honolulu, in the Hawaiian Islands, to procure tools and other necessaries, and to hire workmen for the purpose of obtaining guano at Howland's Island, a place in the Pacific Ocean under the dominion of the Hawaiian government. The guano was to be made ready to load this ship, and others which the owners intended to send out for return cargoes to Europe. The ship went to Honolulu, and thence to Howland's Island, and while lying there received damage which made necessary a return to Honolulu for repairs, in April, 1868. The survey showed a damage estimated at $15,000 in gold, and the repairs were in fact made at something less than that sum. Captain Martin wrote to his owners, and they

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

promised funds, but sent none; and the vessel lay in the port of Honolulu, unable to proceed on her voyage, from the middle of June, when the work was finished, until the sixth of October, when the shipwrights filed a libel in the admiralty against the ship. The master now abandoned the original adventure and undertook to get his vessel home. He made a contract with the libellants, merchants of San Francisco, by which they undertook to pay the claims on the ship, which now amounted to $24,000 in gold, and all necessary expenses in port, and for fitting and preparing the ship for sea, and to charter her for a voyage to New Bedford, taking this bottomry bond, with interest at one per cent a month, and the actual cost of insurance. Captain Martin was very ill of consumption, and in this matter acted through and with the aid and advice of William L. Green, an English merchant resident at Honolulu, and some time British consul and Lloyd's agent there. He now, with Mr. Green's approbation, and that of the British consul, appointed Dennison Hempstead to be master, and the latter superintended the fitting and loading of the vessel. She was ready for sea on the second of January, 1869, on which day the bond was given for $29,305.78 in American gold coin, which is the currency of those islands, with interest and insurance payable in fifteen days after the ship's safe arrival at New Bedford. It was further conditioned that if the sums should not be paid within the fifteen days, an additional premium of ten per cent should be charged and paid. The libel was filed June 26, 1869, after the expiration of the fifteen days, and the several sums demanded, including the additional premium, and reckoning gold at 139, amounted in currency to a little more than $50,000. The owners did not appear, but the claimant, who was a mortgagee, required proof to be made of all the facts propounded in the libel, which required depositions to be taken at Honolulu.

T. D. Eliot and T. M. Stetson, for claimants.

1. The bond is void on its face, because it contains no sea risk, and does provide for insurance at the expense of the ship, for the benefit of the lenders. 2. The master, after writing to his owners, had no authority to borrow money without their express assent. 3. When the original adventure was ended, the power of the master to borrow was gone; and he should have suffered the ship to be sold by the marshal, or, at most, have made some arrangement to send her to San Francisco for sale, and not to the Atlantic coast with a cargo. 4. If he had the power, yet his exercise of it was not proper, because the voyage was so plainly imprudent and ill-advised as to vitiate the bond.

J. C. Dodge and Marston & Crapo, for libellants.

LOWELL, District Judge. I do not understand that there is now any dispute concerning the necessity of the repairs, but only about the propriety of giving the bond. It is not necessary to decide whether a sea risk is essential to the validity of an express hypothecation bearing marine interest, and whether this court would have jurisdiction of such a contract. It is enough to say that the decisions founded on the usury laws may require some modification, since those laws have been abolished in many maritime states, including both England and Massachusetts, whose laws are concerned with this case; and that the admiralty jurisdiction as established in this country, may perhaps extend to some such hypothecations, though not, it seems, to a mere mortgage.

In this case there was a marine risk, for the payment is to be made in fifteen days after the arrival of the vessel at a safe anchorage in New Bedford, or in case of her loss, "such an average as shall, by custom, become due on the salvage." It would not be easy to express a sea risk more plainly. The Nelson, 1 Hagg. Adm. 172; Simonds v. Hodgson, 6 Bing. 114; same case in error, 3 Barn. & Adol. 50. The Indomitable, Swab. 446, was a case of hypothecation resembling a mortgage, to secure a bill of exchange, and the payment was not at all dependent on the voyage, though the contract did look to moneys to be earned on a succeeding voyage. The only point of resemblance is, that the borrower was to pay for the insurance; and on that point the learned judge says: "I agree that if there were a maritime risk, directly stated, the mere fact that the insurance was to be made by the lenders, and paid for by the borrowers, might not invalidate the bond." Page 452. He then refers to The Nelson, 1 Hagg. Adm. 176, as the only case to that point, and as being a very peculiar one, and says the point was taken in argument, but not noticed in the judgment. The case of The Nelson, as reported, does not give the point either in argument or judgment; but as Dr. Lushington was of counsel in that case, no doubt he states the fact correctly, and the case then becomes a precedent favorable to the libellants. There are, however, other cases in which the fact appears, and in one of which the premium of insurance was held not to be a valid item of the account, which made up the principal of the bottomry bond, but the bond itself was upheld. The Boddington's, 2 Hagg. Adm. 422; The Rhadamanthe, 1 Dod. 201. I do not see any legal difference between the bottomry holder charging a sufficient premium to cover the risk, and then insuring his interest, which is every day's practice, and his charging the precise premium which he is obliged to pay. This sum, like all the rest, is at the risk of the voyage.

Coming now to the question of the master's power, I cannot hold that he must wait for express permission to hypothecate. Assum-

ing as we are bound to do on this evidence, in the absence of the letters which the owners might have furnished, that the communications which it is admitted the master made to his owners, were full and sufficient, their silence and neglect authorized him to take such measures as were most expedient, and such as a prudent master would take who could not communicate with his owners. His alternative was to sell or hypothecate; and it cannot be maintained that he had a more ample implied authority to sell than to hypothecate. On the contrary, he had less; for hypothecation on its face is a sacrifice of part, while a sale usually sacrifices the whole.

But it is insisted that when the original voyage was gone, the power to hypothecate went with it. This is a mistake. The powers of the master are to be exercised in all cases for the benefit of the owners, and if his voyage is ended in a foreign port of necessity, his duty is to return the ship to the owners by the best means at his command, and his powers for that purpose are as ample, and his duty as imperative as before. The compendious proposition of Judge Story, cited in argument, that a master can only hypothecate for effectuating the objects of the voyage, and for the safety of the ship, cannot be construed to exclude a voyage of necessity, and the beneficial safety of the ship to her owners. To such a case are fully applicable the memorable words of that other great master of admiralty law: "Necessity creates the law, it supersedes rules, and whatever is reasonable and just in such cases, is likewise legal." The Gratitudine, 3 C. Rob. Adm. 266.

The argument that the ship should have been sent to San Francisco, admits the power of the master, and only questions the manner of its exercise; and concerning that, it is only necessary to say that I have seen no evidence nor any reason to believe that such a voyage was possible excepting in ballast, or, if undertaken, would have been more beneficial to the owners than that to New Bedford.

And this brings me to the last point taken to the general merits of the case, that the voyage to New Bedford was so plainly imprudent, that the bond cannot be upheld. This point was so strongly insisted on, and with such apparent confidence, that I have given it very careful examination. The undertaking is to show by a careful analysis of the accounts, that after applying the charter-money towards the liquidation of the libellants' debt, the ship remains somewhat more incumbered at New Bedford than she was at Honolulu. I do not find this fact to be shown. But in truth this is of slight importance, because it is clear that the master greatly feared a forced sale at Honolulu, and believed it would be entirely ruinous, so that nothing would be left for the owners, and there is no evidence that this belief was unfounded. If this be so, the ship cannot be worse off here than there. His intention was to send his vessel towards home, within reach, so to say, of his owners, and where they would have some opportunity to redeem her, or at least to see that she was not sacrificed; and the appearance of the claimants here convincingly testifies that this object has been accomplished. These two considerations, that to remain was probable ruin, and to send the ship so far towards home gave the persons interested another chance, are amply sufficient to vindicate the conduct of Captain Martin, whether it turns out that the chance is as valuable as he supposed it or not. It is said that there is no evidence that New Bedford is a better market for ships than Honolulu; but I can take notice that it is a larger and richer town, a good deal nearer Glasgow and other markets than is Honolulu. Considering these circumstances, and that the only freight offering was to New Bedford, I cannot doubt that the course taken by Captain Martin, and followed up by Captain Hempstead, not only appeared to be but was that of a prudent and competent master, and well calculated to serve the interests of his owners.[2]

Bond pronounced for.

At a later day the libellants moved for costs to be taxed against the claimants, on their stipulation, the proceeds of sale of the ship being insufficient to pay the bond in full.

LOWELL, District Judge. I regret that so few cases are to be found in the United States on the subject of costs in the admiralty. As a general rule, the prevailing party recovers his costs in admiralty as in other courts. But the judge has a discretion to divide them or refuse them altogether. There are many cases in which a libellant who appeared to have a good cause of action, and has been defeated upon a doubtful point of law, or even of fact, has had his cause dismissed without costs. There are several such in bottomry suits, where the lender has advanced his money in good faith, but the master had done wrong in giving the hypothecation.

So where the libellant prevails, the most usual decree is for his debt or damages and costs. If the res is sold, by order of court, as in this case, and proves to be insufficient, we must look carefully at the position and conduct of the parties, and the nature of the case. Some causes of action, as those of affreightment, collision, wages, &c., arise out of contracts or torts in which the owner is personally bound by the acts of the master, and the insufficiency of the res forms no ground for exonerating him, unless by virtue of some statute limitation of his liability; and even under such statutes he is usually

---

[2] The judge said that some of the items of the account might be invalid, especially the ten per cent premium; but these points became unimportant because the vessel brought a price insufficient to pay the undisputed items.

held for costs. But in bottomry and salvage causes, the property alone is liable, and there may be some cases in which one having an interest may intervene without subjecting himself personally to costs.

I consider this to be such a case, for these reasons: The claimants are the first mortgagees of the ship, and were not in possession, and so far as appears, had nothing to do with the voyage or the appointment of the master, and were not consulted or notified before the money was raised by hypothecation, or the substituted master was obtained. They found their vessel in a foreign port, out of the course of her employment, and hypothecated to the charterers. Such a state of affairs raised questions of law and fact which they might reasonably litigate to the extent they have done, without personal liability for costs. The Kennersley Castle, 3 Hagg. Adm. 9.

The decree will be for costs, but not against the claimants and their stipulators personally.