## THE JENNIE B. GILKEY.

### BAKER and others *v.* LORING.

*(Circuit Court, D. Massachusetts. January 22, 1884.)*

1. ADMIRALTY LAW — SCHOONER'S LIABILITY FOR NECESSARY SUPPLIES — WHAT CONSIDERED THE "HOME PORT" OF A VESSEL — RESIDENCE OF OWNER OR MASTER.

   It is well established that the port of registry is *prima facie* the home port of a vessel, and this presumption must be overcome by clear proof, before any other home is taken as the true one; but it has often been decided, too, that the place of residence of the owners of a vessel is to be considered the home port, even when the registration is in another state, if the facts of ownership and residence were known, or might have been known, to the material-man. But as to majority and minority ownership, or as between the managing or not managing ownership, *quære.*

2. SAME — NAME OF PORT ON THE STERN.

   The statute requiring the name of the port of registry to be painted on a vessel's stern is intended to give to all persons interested notice of the home of the vesssel.

3. SAME — MASTER — "ACTING AND MANAGING OWNER" — SAILING ON SHARES.

   Where a schooner was sailed by the master on shares, he to supply and man her, and pay a certain part of the net earnings to the owners, *held,* that he was not the "acting and managing owner," in the sense of Rev. St. § 4141, but the charterer; and that his sailing on foreign voyages from New York more or less often would not make New York his "usual residence," under that section, if his family lived in Massachusetts.

4. SAME—INSURANCE—PREMIUM.

> *It seems* that premiums of insurance are not necessaries for a ship; and *held* that where the account of a material-man was insured with the consent of the master and of one part owner, and the account was a charge on the ship but not on the owners personally, there was no privilege for the premiums.

In Admiralty.

*C. T. Russell* and *C. T. Russell, Jr.,* for libelants, appellants.

*Geo. M. Reed,* for claimant.

LOWELL, J. The schooner Jennie B. Gilkey was sold in the district court, and certain debts which were admitted to be privileged were paid out of the proceeds. The libel of H. M. Baker & Co., of New York, for necessary supplies furnished the master in New York, for his last voyage, was rejected, because, according to the evidence in that court, New York appeared to be the home port of the schooner. A new case is made in this court, and has been very thoroughly prepared and argued, both upon the facts and the law. The claimant, Mr. Loring, owns the greater part of the vessel, and contests the lien of the libelants. When these supplies were furnished, the vessel was owned in Massachusetts, Maine, and New Hampshire, excepting that Loud & Co., of New York, owned one sixty-fourth part. The case for the libelants is, that the schooner was built and largely owned in Boston, and had a permanent register in that port; that "Boston" was painted on her stern; that they believed, and had reason to believe, that she was a Boston vessel; and that in fact she was so. The contention of the claimant is, that New York was the home port of the vessel, because Loud & Co., of that city, were her managing owners; or that the master was such owner, and usually resided in New York; that, therefore, she should have been registered there; and that admiralty, like equity, will hold that to be done which ought to have been done. If Loud & Co. were the husbands, or acting and managing owners, of the vessel, the registration should have been changed to New York when they were appointed to that office. Rev. St. § 4141. It does not necessarily follow that New York became, *ipso facto,* the home port, without change of registration. I have seen no case which decides that the home port shifts as often as the managing owner is changed, without change of papers, or that material-men are bound to discover who is the managing owner of a vessel, or what place is his usual place of residence. One case decides that the port of enrollment is the home port, if the managing owner lives there, though a majority of the owners live in another state. *The Indiana,* Crabbe, 479. In that case the decree was that the vessel changed her home port from a certain day, which was that of her new enrollment at the port of the managing owner, and not that of the sale to him; but the time between the conveyance and the enrollment was trifling, and the point does not appear to have attracted attention.

It has often been decided that the place of residence of the owners

is to be considered the home port, even when the registration is in another state, if the facts of ownership and residence were known, or might have been known, to the material-man, (*The Golden Gate*, Newb. 308; *The Albany*, 4 Dill. 439; *The E. A. Barnard*, 2 Fed. Rep. 712; *The Mary Chilton*, 4 Fed. Rep. 847;) but I have seen no case which brought up any question between majority and minority ownership, or between the managing and not managing ownership, in a case of this kind. It is equally well established that the port of registry is, in a case of this kind, *prima facie* the home port, to be overcome by clear proof, before any other home is taken as the true one. *The Superior*, Newb. 176; *The Sarah Starr*, 1 Sprague, 453; 2 Pars. Shipp. & Adm. 326. Mr. Justice Clifford said that the statute requiring the name of the port of registry to be painted on the stern is intended to give to all persons interested notice of the home of the vessel, and this statement is quoted in an opinion in the supreme court. *The Martha Washington*, 1 Cliff. 463, 466; *Morgan* v. *Parham*, 16 Wall. 471, 475. As I find the facts to be in this case, it will not be necessary to go beyond these decisions.

Loud & Co. testify that they acted merely as brokers or consignees of the vessel, and neither had, nor assumed to have, any of the powers of managing owners; and this is confirmed by all the evidence. The schooner's voyages, during some years, were chiefly between New York and foreign ports, and, as is so common with New England vessels, the master sailed her on shares. He undoubtedly took the responsibility, and gave the orders for all the voyages and business of the vessel; and Loud & Co. acted precisely as they did for all other vessels which they disbursed. The fact that New York was the headquarters of the vessel, as it must be of general freighting vessels on this coast, has no effect to make it the home port. *Hayes* v. *Pacific Mail Co.* 17 How. 596; *Morgan* v. *Parham*, 16 Wall. 471.

In taking out registration, Mr. Loring, the present claimant, represented himself to be the managing owner. He says that he signed the papers because he was told by Capt. Gilkey, his brother-in-law, that they were necessary, and knew nothing about their contents, which I take to be the fact. Still, Mr. Loring was the largest owner, and all the managing owner that the vessel had, unless the master shall be considered so. I agree with the claimant that it is doubtful whether the master can be the ship's husband, or acting and managing owner in the sense of this statute; but, however this may be, I do not find, as a fact, that Capt. Gilkey was such husband, or acting and managing owner, nor that he usually resided in New York. He managed the voyages of the vessel, as charterer and special owner, not as ship's husband, in the sense of the statute; nor did he reside in New York. Judge Ware decided that a merchant who passed most of his time in New York might be considered as usually residing there, though he was domiciled in Maine. *The St. Lawrence*, 3 Ware, 211. I have my doubts of the soundness of this opinion, but

do not now controvert it. Capt. Gilkey was often in New York, but it was because his vessel happened to be there at the end of his voyages. He called himself a resident of Boston, or of Somerville, which is a suburb of Boston, and his family lived in Somerville, and it is not proved that either he, or any one else, ever supposed that he usually resided in New York. I cannot think that, if the statute would ever admit the master to be the managing owner, it intends to say that his usual residence shall shift with the shifting business of his vessel. Seamen are considered to reside, for all municipal purposes, of voting, taxation, distribution of estates, etc., where their families live, and they consider themselves to have their home. *Guier* v. *O'Donnell*, 1 Bin. 349, note; *Boothbay* v. *Wiscasset*, 3 Greenl. 354; *Hallet* v. *Bassett*, 100 Mass. 167. While I do not, at the present time, dissent from Judge WARE's opinion that a business man may have a usual residence apart from his family, I hold that the master of a vessel does not acquire such a residence by putting into a foreign port more or less often. I hold, therefore, that the schooner was properly registered in Boston, and was a foreign vessel in New York, and that the libelants have a privilege for the supplies furnished her.

The only disputed items of the account are the premiums of insurance. The evidence upon this point is not very full. I understand that the vessel sailed on her last voyage in 1878, and suffered damage which caused heavy expenses in a foreign port; that the owners contributed funds to redeem her, and afterwards became dissatisfied with the conduct of Capt. Gilkey, and sent out another master who brought the vessel to Boston in 1881. The libelants, in the mean time, having had general authority or instructions from the master to that effect, kept themselves insured by annual policies, and the principal charges of this kind are for these insurances. There is, besides, a charge for insurance on freight in one of the voyages, which was authorized by the master. In August, 1880, the claimant, in answer to a letter from the libelants, which is not in evidence, wrote: "Think your bill against schooner Jennie B. Gilkey should be covered by a yearly policy, so to get the best rate you can, at the same time be able to cancel at any time." The next year he wrote a much more cautious letter, in which he referred them to any instructions they may have had from the master. It is apparent, on the face of this second letter, that he was afraid that he had committed himself in 1880. I am of opinion that neither the master nor the claimant had authority to charge the ship with premiums of insurance paid in New York to secure the libelant's account.

There is some difference of opinion whether insurance, though duly authorized, gives the underwriters a privilege for the premiums. The better opinion appears to be that it does not, because insurance is not a necessary supply for the ship itself, but only a prudent security for the proprietary interests of her owners. Compare *The Collier*,

3 West. Law M. 521; *The John T. Moore*, 3 Woods, 61; *The Heinrich Bjorn*, 8 Prob. Div. 151; *The Dolphin*, 1 Flippen, 580, and the reporter's note; *The Guiding Star*, 9 FED. REP. 521; *The Riga*, L. R. 3 Adm. & Ecc. 516.

The strongest argument made by the libelants is that the premiums may be regarded like interest, as a charge for delay of payment. In some bottomry bonds such a charge is made by agreement; but whether the courts will uphold it, is doubtful. See *The Boddingtons*, 2 Hagg. 422; *The Robert L. Lane*, 1 Lowell, 388; where the question was not decided, but only referred to. If it were proved that by a general, long-established, and well-known custom, premiums of insurance are to be added to the account by way of consideration for the forbearance, they might possibly be allowed, on the theory that the charge for interest was proportionally diminished, or that the arrangement was an entire one, from which no one item was to be separated. No such evidence was offered.

It must be remembered that the schooner was sailed on shares under a parol charter, which required the master to supply the vessel for her voyage, though not to repair her. The schooner is liable for necessaries by virtue of a fiction of the admiralty courts, known to all the parties, and admitted in this case. But the insurance did not benefit the owners, for they were not personally responsible for this debt. The case appears somewhat stronger against the charge than if it were made in bottomry, inasmuch as the exigency was less. In bottomry, the owner is communicated with, in most cases, and if he cannot advance the money, the master must raise it on the best terms he can get. Here the libelants supposed, though they did not inquire, that the master was sailing the vessel on shares, and they therefore supposed it to be important for them to insure, because they had no resort to the owners. They protected their own interest, as a mortgagee might do, and can no more charge the premium against the ship than a mortgagee could charge it against the estate in the absence of a positive stipulation to that effect. I reject the items for premiums of insurance.

Decree for the libelants.