*In re* Petition of INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA for the Proceeds of the Barge Waubaushene.

(*District Court, N. D. New York.* 1884.)

1. MARINE INSURANCE — PAYMENT OF PREMIUMS — DELIVERY OF POLICY CONTAINING RECEIPT.

 The delivery of the policy of insurance to the assured, containing a receipt for the premium, estops the company, for the reason that the receipt is conclusive evidence of payment; to the extent, at least, that such payment is necessary to give validity to the contract. The company will not be permitted to say that no contract was made.

2. SAME—UNAUTHORIZED ACT OF AGENT—RATIFICATION.

 When the unauthorized act of an agent is ratified by the principal, the ratification relates back to the time of the inception of the transaction, and the act is treated throughout as if it were originally authorized.

3. SAME—CONTRACT—WHERE MADE.

 The agents of an insurance company in Buffalo, New York, at the request of an agent in Canada, insured a Canadian vessel. The note given for the premium was dated and signed in Canada, and made payable at a Canadian bank, and the policy, containing the receipt for the premium note, was delivered to the assured in Canada. *Held*, that the contract was made in Canada, and that the case was governed by the Canadian law.

4. SAME—LIEN FOR UNPAID PREMIUMS—NEW YORK STATUTE—FOREIGN VESSEL.

 The law of New York creating a lien in favor of underwriters for unpaid premiums of insurance, has no relation to insurance on a foreign vessel, the contract for which is made in a foreign country.

5. SAME—MARITIME LIEN.

 No general lien is created by the maritime law, in favor of the insurer, for unpaid premiums.

Motion to Confirm Report in Favor of Petitioner.

*Benjamin H. Williams,* for petitioner.

*Willis O. Chapin,* for respondent.

COXE, J. The petitioner is a marine insurance company of the state of Pennsylvania, doing business at Buffalo, in this state, where Crosby and Dimick are its general agents. They are also agents, either individually or as a firm, of three other marine insurance companies. The companies represented by them are known as the "Big Four." The barge Waubaushene is a Canadian vessel, registered at Toronto, Ontario. . Her owner, Milton S. May, of London, Canada, applied in March, 1883, to A. H. Dalziel, an insurance agent and broker at Sarnia, Canada, for insurance upon her and other barges owned by him. The barge having been inspected at Buffalo, it was concluded to apply to Crosby and Dimick for insurance, it being understood that no one of their companies would write all the policies, that an application made to one would answer as well for each of the other three, and that the agents reserved the privilege to divide the risk according to the amount which each company would consent to assume. The application for the Waubaushene was made to the Thames & Mersey Marine Insurance Company, (one of the "Big Four,") and was dated March 30, 1883. The insurance asked for was $5,700, the applicant agreeing to give a note for the premium ($384.75) at six months, indorsed by J. C. Miller and Robert Moat, payable at the Bank of Montreal. The application, made on one of the company's printed blanks, contained the following:

"This application to be considered binding until rejected and due notice given the applicant; or approved, and the contract of insurance perfected by the issue of the company's policy."

The application was filled up by Dalziel, and sent by him to Crosby and Dimick. In all this he acted for May. Crosby and Dimick received the application, and in response issued two policies,—one in the Pennsylvania Company, (this petitioner,) for $1,700, the other in the Thames & Mersey Company, for $4,000. The policies, together with the premium notes, ready for signature, were sent to Dalziel by mail. The policies were delivered to May, and the notes, signed by him, but not indorsed, were returned to Dalziel, who mailed them to Crosby and Dimick. The notes so signed were accepted and retained. The policy in question contains a provision that it shall not be binding until countersigned by the general agents at Buffalo. It was so countersigned at the time of delivery. It also provides, in substance, that in case of loss or misfortune, if the insurer is required to pay for repairs, etc., more than its just proportion, the surplus (with the premium note, if unpaid) shall be a lien upon, and shall be recoverable against, the vessel, or against the insured at the option of the insurer. The policy also contains the following receipt:

"The assured hereby acknowleges the receipt of a note, at 6 months from May 1, '83, for the amount of the consideration of this insurance, which, at the rate of $6\frac{3}{4}$ per cent. on $1,700, is $114.75."

The words "A. H. Dalziel, Agent at Sarnia, Ont.," are indorsed on the policy in the same handwriting, apparently, which appears on its face. The premium note is dated at Sarnia, Ontario, May 1, 1883; is made payable, not to the order of either of the persons proposed in the original application as indorsers, but to the order of the insurance company itself. The note recites that it is given for "premium of insurance on schooner barge Waubaushene, policy No. 611, of Sarnia, Ontario, A. H. D. (A. H. Dalziel) Agency, Insurance Co. of the state of Pennsylvania," and that if it is "not paid at maturity the full amount of premium shall be considered as earned, and the said policy becomes void, while the amount remains overdue and unpaid." The note was indorsed by the company, Crosby and Dimick general agents. The policy extended from May 1 to November 30, 1883, and was by special clause confined to "total loss and general average only."

Upon the hearing before the commissioner the note was surrendered. It has never been paid. The barge having been sold by order of the court in another proceeding, the petitioner now seeks to have the amount of the premium paid from the surplus in the registry of the court. The respondent, as mortgagee, resists this attempt, insisting that the debt is a mere personal contract of the owner, carrying with it no privilege against the ship.

The questions which the court must examine are these: *First*, was the contract made in the state of New York or in Canada? In other words, is the controversy to be determined by the law of this country or Canada? *Second*, has the law of New York, creating a lien in favor of underwriters for unpaid premiums, any application to this case? *Third*, is a general lien created by the maritime law of this country? The commissioner to whom the cause was referred decided—*First*, that the contract of insurance was made in New York; *second*, that the New York law has no application to a Canadian vessel; *third*, that a maritime lien for unpaid premiums does exist in favor of the insurer. That the commissioner was correct as to the second proposition I have little doubt, but am constrained to disagree with him as to the other two.

Where was the contract made? It cannot be said that any binding contract was entered into when the policy was made out and mailed at Buffalo, for the reason that it differs wholly from the application. *Eliason* v. *Henshaw*, 4 Wheat. 225. The minds of the parties did not meet. They did meet, however, when, at Sarnia, Ontario, May accepted the contract and signed the note in the precise form adopted by the company. It is argued for the petitioner that as May agreed to give an indorsed note and did not do so, the minds of the parties did not come together until the unindorsed note was accepted by the agents at Buffalo. Hence the contract was made there. The provision for an indorsed note was for the benefit of the insurers. Unquestionably, they could waive it. That they did waive it there is little doubt. They sent to Dalziel, who for this purpose

was their agent, made so by this act, a policy of insurance and a note, with instructions to deliver the one and return the other properly signed. The departure from the application was made, in the first instance, by the insurers. They knew that the owner of the Waubaushene had made no application to insure her in their company, that he had not even mentioned its name in this connection, and it may well be questioned whether they were in a position to demand from him any unusual conditions. But let it be assumed that, under the peculiar circumstances attending this application, they were justified in exacting an indorsed note. They did not do so, and the evidence seems to warrant the conclusion that they did not intend to do so. Mr. Marshall, who, on behalf of the company, sent the papers to Dalziel from Buffalo, testified:

"My purpose in sending the note was to have Dalziel procure it to be signed by the insured and to return to us. This was done. This is the way we always do with Dalziel or any other applicant, and he is expected to have the note executed and returned. * * * The general instructions to all our agents and brokers are to have the note signed when they deliver the policies, and Dalziel was included in this number."

There is no pretense that Dalziel had any special instructions in this case. Certainly he was not asked to obtain an indorsed note. Had he entertained any doubt on the subject, the form of the policy and the note must have removed it. The policy was complete and ready to deliver. It acknowledged receipt of the note in the ordinary form. The note, made payable to the company's own order and not to the order of the proposed indorser, completely negatived the idea that anything but the signature of May was required. If the insurers intended to rely upon the agreement in the original application, would they not have made the note payable to the order of Miller or Moat? Most certainly. They had departed from many of the provisions and stipulations of the application. They waived others. This was one of them. In the application the note was to be made payable at the Bank of Montreal. In the note sent Dalziel the space designed for the insertion of the place of payment was left blank. This was a waiver of that condition, and can it be successfully argued that had May inserted some other bank the contract would have been incomplete till the agents at Buffalo had assented to the change? It is thought not. But assuming that they did not intend to issue the policy until an indorsed note had been executed, are they in a position to maintain such a proposition? Are they not concluded by their own acts? They made Dalziel their agent to deliver the policy and return the note to the company. They refer to him on the back of the policy as "Agent at Sarnia, Ont." In the note they refer to the policy as of the "Sarnia, Ont., A. H. D. Agency." They held Dalziel out to May as the person with whom he was to deal, at least so far as the delivery of the policy and the return of the note was concerned. And when to this is added the fact that they gave May a receipt "for

the amount of the consideration of this insurance," it is, indeed, difficult to understand upon what theory they can now be heard to say that no contract was consummated at Sarnia.

It has frequently been held that a delivery of the policy to the assured containing a receipt for the premium estops the company, for the reason that the receipt is conclusive evidence of payment, to the extent at least that such payment is necessary to give validity to the contract. 3 Kent, Comm. 260; *Provident Ins. Co. v. Fennell*, 49 Ill. 180; *Busch v. Humboldt Ins. Co.* 35 N. J. Law 429.

Had the vessel been lost while the note was yet in the mails between Sarnia and Buffalo, it is thought that May could have recovered the insurance upon the ground that the contract was executed between him and the company. If the agreement was not as favorable to the insurers as they could wish, they have no one but themselves to blame; it was their negligence and not May's that produced this result. But again, let it be assumed that Dalziel had no authority to act for the company; that his acceptance of the note was not authorized, and that the insurers are not by their own acts estopped from asserting that no contract was made. Did not their subsequent conduct ratify the agreement? What Dalziel did, if he had authority to do it, consummated a valid contract. This will hardly be disputed. But the insurers accepted the note which they now say he was not authorized to take. Did they, by this act, make a new contract, or did they ratify the old one? Plainly, the latter. The ratification related back to the original act. It could relate to no other act.

Judge STORY, speaking of the rule of ratification, says: "In short, the act is treated throughout as if it were originally authorized by the principal; for the ratification relates back to the time of the inception of the transaction, and has a complete retroactive efficacy." Story, Ag. § 244. See, also, *Soames v. Spencer*, 1 Dowl. & R. 32, (16 E. C. L. 14;) *Moss v. Rossie Lead M. Co.* 5 Hill, 137; *Lawrence v. Taylor*, Id. 107; *Hankins v. Baker*, 46 N. Y. 670.

The case is not like *Shuenfeldt v. Junkermann*, 20 FED. REP. 359, where the defendants were endeavoring by a disingenuous defense to avoid the obligation imposed upon them by a contract fairly made, and of which they had had the full benefit. The court strained the rule in that case to uphold the contract, and prevent the success of an unfair proceeding.

The subject of the insurance was a Canadian vessel. The note, payable at a Canadian bank, was dated and signed in Canada. The policy, containing a receipt for the premium note, was delivered in Canada. The ratification, if ratification were needed, related back to what took place in Canada. It must be held, therefore, that the contract was made in Canada, and, as a necessary result, that the case must be determined by Canadian law. *Heebner v. Eagle Ins. Co.* 10 Gray, 131, 143; *Male v. Roberts*, 3 Esp. 163; *Thwing v. Great West. Ins. Co.* 111 Mass. 93; Wood, Fire Ins. § 93.

It is not contended by the petitioner that a lien is created for such a debt by Canadian or English law. It seems to be conceded that a debt contracted in these circumstances in Canada gives the creditor nothing but a personal claim against his debtor. The evidence before the commissioner was positive in this regard, and was not questioned by the petitioner. These considerations also effectually dispose of the second question above referred to relating to the lien created by the statutes of our state. Regardless of the place of contract, it will hardly be asserted that such a law has any relation to insurance on a foreign vessel. *Moores* v. *Lunt*, 4 N. Y. Sup. Ct. Rep. (Thomp. & C.) 154; affirmed, 60 N. Y. 649. See, also, *Brookman* v. *Hamill*, 43 N. Y. 554.

When, however, the additional fact appears that the contract is also a foreign one, all possible doubt is removed. The operation of the statute is, by express terms, confined to contracts made within this state.

But it is argued that, irrespective of the *lex loci contractus*, the lien should be enforced if recognized by the *lex fori;* that the question resolves itself into one of remedy only. I cannot accept this view. The court should hesitate to give a party a lien when his contract gives him none. · As was said by Mr. Justice BRADLEY in *The Lottawanna*, 21 Wall. 558, 579: "A lien is a right of property, and not a mere matter of procedure." Should the petitioner obtain a decree, it will be enforced according to the law of the forum. But this question stands at the very threshold of its right to obtain a decree. The respondent insists that petitioner has no standing in court unless it establishes a lien, and the proof shows that it has no lien. The argument that a lien should be established simply because the action is brought in this court, would lead logically to the conclusion that material-men, who furnished the barge with supplies at Toronto, where no privilege exists, could acquire one by bringing their action here. A lien once established will be enforced according to our own and not Canadian procedure. But our courts should not attempt to give rights to suitors which they do not possess at the time they commence their proceedings. If there is here a right to the surplus, it can rest only on the theory that petitioner had a lien which attached to the ship. As it had no privilege against the ship, it can have none against the proceeds.

Judge STORY, in his Conflict of Laws, says, at page 453, (8th Ed.:)

"Where the lien or privilege is created by the *lex loci contractus*, it will generally, although not universally, be respected and enforced in all places where the property is found, or where the right can be beneficially enforced by the *lex fori*. And on the other hand, where the privilege or lien does not exist in the place of the contract it will not be allowed in another country, although the local law where the suit is brought would otherwise sustain it."

I am clearly of the opinion that the insurers cannot succeed, for the reasons that the contract was made in Canada, and having no

privilege there there can be none anywhere. I am aware, however, that there is not entire unanimity among the authorities upon the last question considered. Namely, whether the law of the contract or the law of the forum should be controlling? See *The Maggie Hammond*, 9 Wall. 435, 451, 452; *Scudder* v. *Union Nat. Bank*, 91 U. S. 406, 412, 413; *Harrison* v. *Sterry*, 5 Cranch, 289; *The Union*, 1 Lush. 137; *Ogden* v. *Saunders*, 12 Wheat. 213, 361.

But the case will be relieved of all perplexity on this score should the conclusion be reached that by the *lex fori*, also, no maritime lien exists. Although a determination of this question may not be necessary after the finding that the contract was made in Canada, yet, it is thought proper to decide it in view of the possible doubt above referred to; and for the further reason that a matter of such importance to insurer and insured may not longer be left open to conjecture in this district. Inasmuch as there is a clause in the policy making the premium a lien in case of misfortune and loss only, and a provision in the note rendering the policy void in case of non-payment; it is by no means certain that a privilege would be sustained in any tribunal. For it may, with plausibility, be argued that no benefit could possibly accrue to the ship after the policy was forfeited; that the underwriters preferred the penalty to the lien. But these considerations are, perhaps, subordinate to the main question, which is: Does our law recognize a maritime lien for unpaid premiums in favor of underwriters? The affirmative of this proposition is held by the following authorities, where the lien is relegated to the lowest class of maritime privileges. *The Dolphin*, 1 Flippin, 580; affirmed in a qualified way, Id. 592; *The Illinois*, decided on the authority of *The Dolphin*, 2 Flippin, 383; *The Guiding Star*, 9 FED. REP. 521; affirmed, 18 FED. REP. 263. In this case the lien was sustained because given by a state statute upon vessels navigating the waters of the state, or bordering thereon.

The following cases decide against the lien: *The Jenney B. Gilkey*, 19 FED. REP. 127; *The John T. Moore*, 3 Woods, C. C. 61; *The Robert L. Lane*, 1 Low. 388, where the question is referred to, but not decided. See, also, the note to *The Dolphin*, in which the reporter has collected numerous authorities bearing upon the subject. The argument against the lien seems to me to have the most weight. That the contract of insurance upon a ship is in its nature maritime, is no longer an open question. *Insurance Co.* v. *Dunham*, 11 Wall. 1. It is, however, a contract for the personal indemnity of the insured. The credit is given to him, not to the ship. The principle upon which the law recognizes a lien for necessaries is that the ship may thus be enabled to engage in the competitions of commerce. Security is given the material-man, it is true, but the chief benefit is to the ship. It enables her to sail. A contract of insurance in no way aids the ship. She sails no better and no faster because of the insurance. It puts no steam in her boilers, and no wind in her sails. Insured and un

insured vessels are tossed alike by the tempest, and are alike liable to "the peril of waters, winds, and rocks." Indeed, there are those uncharitable enough to assert that a liberal insurance on a vessel does not tend to make her master and crew more diligent in guarding against danger, or more obstinate in refusing to abandon her to her fate. It is argued with considerable force that the contract is frequently one for an indemnity against partial as well as total loss, and contains numerous provisions for repairs, salvage, etc. But these provisions are incidental to the main agreement, are often optional with the underwriters, and are inserted for their benefit rather than for that of the insured. The advantage to the vessel is in the future, and depends upon many remote contingencies. It is in this respect different from every other service to which a privilege attaches. If insurance were regarded by the admiralty as essential for the proper equipment of the ship, would not the ship's husband and master have been permitted to contract for it? Yet neither can do this, though both have the right, generally, to bind the ship for necessaries.

If, in case of loss, the liens were transferred to the insurance money there would be great cogency in the argument that the ship is benefited. An insured ship would then be able to offer additional security to those furnishing her with necessaries. But such is not the case. As is said in *The John T. Moore, supra:* "In case of loss the maritime liens upon the vessel are displaced and do not follow the insurance money. The money goes to the owner and not to the lien-holder, who may insure his own interest." Again, unless distinguishable in some way from maritime privileges in general, the lien, if established, must cover the entire ship and not alone the insurer's interest. It must proceed upon the theory that the credit of the ship is pledged. It must be a lien enabling its holder to seize and sell the ship wherever found. It must follow the proceeds wherever they may be. But all who have an interest in the ship may insure; part owners, lienholders, and mortgagees. Upon what principle of law should the owner of a twentieth part be permitted to create a lien upon the other nineteen-twentieths, because he is in default to the underwriters for the risk they have run on his behalf? A case might easily be imagined where the insurers could seize a ship and sell her, or cause great loss, upon a claim for premiums on a policy issued to a lienholder or mortgagee. Parties having interests of this character ought not to be permitted to protect themselves at the expense of the ship. And yet, if the principle is once admitted, upon what theory can they be excluded? Unless the ship is benefited the ship should not pay.

Another objection is the almost absolute impossibility of ascertaining the existence of the incumbrance. The courts do not and ought not to favor secret liens. They should not be extended. And yet the most diligent inquiry might fail to discover liens of this character. This is not true to the same extent of other maritime privileges. An

examination of the ship or inquiries addressed to her master and crew will in almost every instance reveal her liabilities. But what method of investigation would enable a proposed purchaser or charterer to discover, for instance, that a lien existed in favor of a foreign insurance company for a policy issued to a former part owner?

The interests of the underwriters can be fully protected without the lien, and it is thought that no sound reasoning, drawn from the law maritime, can be invoked in its favor, but, on the contrary, its establishment will lead to confusion and often to injustice, without corresponding advantage. The exceptions of respondent are sustained.