## Case No. 12,234.

### The ST. LAWRENCE.

[3 Ware, 211.] [1]

### District Court, D. Maine. 1859.

MARITIME LIENS—MATERIALMEN—MASTER—POWER TO CHARGE—DISTRICT FOR ENROLLING.

1. By the maritime law, every person who furnishes materials or labor for the building and repair of a ship has a lien or privilege on her for his pay unless the privilege is expressly waived by the terms of the contract.
[Cited in The Ellen Holgate, 30 Fed. 127.]

2. The legal right of the master to charge the vessel for repairs.

3. When a ship's husband had his legal domicile at Northport, in Maine, but passed two-thirds of his time, and did his business at New York, the latter was held to be the proper district for enrolling and licensing the vessel under the act of Feb. 18, 1793 [1 Stat. 305].
[Cited in The Rapid Transit, 11 Fed. 329; The Jennie B. Gilkey, 19 Fed. 129; The Ellen Holgate, 30 Fed. 126.]

In admiralty.

Mr. Barnes, for libellant.
Mr. Shepley, for respondent.

WARE, District Judge. This is a libel brought by Wm. J. Currier against the schooner St. Lawrence, for supplies and repairs furnished her while lying in the port of Bangor, in this state. It is not denied that the articles charged, the principal of which was a second-hand mainsail, were furnished, that they have not been paid for, or that

---

[1] [Reported by George F. Emery, Esq.]

the price is justly due to the creditor. But it is contended that he has mistaken his remedy; that in law the vessel is not liable for the debt, but that it is merely the personal debt of the owners, and entitled to no privilege against the ship. The schooner was owned in moieties by Wm. Bush of New York, and John Patterson of Northport, in this state. Patterson purchased his half April 8, 1858, and became ship's husband. She was enrolled by the owners, and licensed in New York, and let by them to John W. Dickey, as master, to be employed by him on shares in the coasting trade. Under this well-known contract, the profits are divided between the hirer and the owners; the hirer is at the expense of victualing and manning the vessel, certain port charges being paid in common, and the owners are to keep the vessel in repair. Patterson, the ship's husband, had his legal domicile in Northport, where his family resided, but his principal business was at New York, and that was his most usual place of residence.

By the general maritime law, every person who furnishes supplies for a vessel, whether repairs for the ship or provisions for the crew, has a privileged claim, in our law, called a lien against the vessel for the price of his supplies. It is a principle of the maritime law, as old as the law itself. He is considered as trusting the vessel itself; that is treated as his debtor, and the suit is in rem directly against the thing in specie, and not circuitously as in the Roman law against the person having the possession or claiming the ownership. But by the maritime law of this country, this privileged lien is held to exist only when the supplies are for a foreign ship. This was decided in the case of The Gen. Smith, 4 Wheat. [17 U. S.] 438. And in the same case it was decided that within the meaning of our maritime law, and for the purpose of creating this lien, a ship is to be considered as a foreign ship, when she is in a port of any one of the United States other than that to which she belongs. This vessel was enrolled and licensed in the district of New York, and within the rule established by the case of The Gen. Smith, she is to be considered and treated as a foreign vessel in Bangor, provided she was enrolled in the proper collection district. By the registry act of December, 1792 [1 Stat. 287], § 3, and the license act of Feb. 18, 1793 [1 Stat. 305], vessels are required to be registered or enrolled in the collection district that comprehends the port to which they belong; "which port shall be deemed to be that, at which or nearest which, the owner, if there be but one, or if more than one, the husband or managing owner of such ship or vessel usually resides." The managing owner in this case had his legal domicile at Northport, where his family resided, and where he exercised the right of ownership. But his business was in New York, and there he resided

two-thirds of the year. I think that New York was the place of his usual residence within the meaning of our navigation laws, and that she was properly enrolled there; and that by our maritime law for the purposes of the lien here sought to be enforced the schooner in Bangor was a foreign vessel. The lien, therefore, attached, unless it is excluded by another objection urged by the claimant's counsel. These supplies were obtained on the order of the master, and it is contended that the master has no authority to charge the vessel for repairs or supplies, whether at home or abroad, when the owner is present, or when he has a correspondent, and they can be obtained on personal credit. And in this case, it is argued, that though the part owner, Patterson, was not present in person, his home was in the neighborhood, where the fortune of his family was found, and where he had a personal credit that was equivalent, at least, to a correspondent. Such as is stated is undoubtedly the limitation of the master's authority to charge the vessel by a bottomry bond with maritime interest. I am not prepared to admit that it follows as a legal consequence, that the same limitation applies to charging the vessel with the common maritime lien bearing common interest. Emerig. Cont. à la Grosse.

But however this may be, I do not think the question is necessarily involved in this case. The master, in his deposition, expressly says that the schooner needed a new mainsail, and it seems that both the owners thought so, also, and directed him to purchase a second-hand sail, which he accordingly did. The captain, therefore, may justly be considered as acting, not under his implied power as master, but under the express authority of the owners themselves. The contract will, therefore, have the same legal effect as though the supplies were furnished on the personal order of the owners. And in that case, the ship will be bound, unless by the terms of the contract her liability is excluded. So far from this being the case, the master, in his deposition, says the supplies were expressly furnished on the credit of the ship, and no terms of credit were given, which could be construed into an implied waiver of the lien. In that case, on the general and familiar principles of the maritime law, a lien results as a matter of course. Every person who loans money for the building or repair of a ship has a privilege against the ship for the repayment of the money, and the privilege extends as well to the person who furnishes the repairs and materials, as to the creditor who lends money to pay for them. Emerig. Cont. à la Grosse, c. 12, §§ 3, 4, and this text, as well as others of a like character, has been so often quoted as equally true in the maritime law, which, in fact, borrowed it from that of Rome, by all the writers of the highest authority, that if the doctrine is now to be brought into doubt,

we may as well discard all tradition of the maritime law as a fiction or a dream. I am aware of the remark incidentally made by the judge who pronounced the opinion of the court in the case of The Sultana (Pratt v. Reed) 19 How. [60 U. S.] 361, which seems to imply that the owner himself cannot subject the vessel to this lien, when the supplies can be obtained on personal credit. That case might be well decided on its own particular facts, and did not of necessity require the decision of this general question. And I cannot suppose that the court intended to overthrow in this incidental way, a principle of the general and public maritime law, acknowledged and acted upon by the whole commercial world from the earliest times. I feel bound to pronounce for the lien.