## Case No. 131.

### The ALBANY.

[4 Dill. 439;[1] 15 Alb. Law J. 67; 4 Cent. Law J. 16.]

Circuit Court, D. Minnesota, 1876.

MARITIME LIENS—HOME PORT—RESIDENCE OF OWNER—PLACE OF ENROLLMENT.

1. A material-man has no lien for repairs or supplies to a domestic vessel.

[Cited in The Mary Chilton, 4 Fed. Rep. 848; The Rapid Transit, 11 Fed. Rep. 329; The G. F. Brown, 24 Fed. Rep. 400; The Menominie, 36 Fed. Rep. 198.]

2. Whether a vessel is foreign or domestic, depends upon the residence of her owners, and not upon her enrollment, where the two are different.

[Cited in The Jennie B. Gilkey, 19 Fed. Rep. 129; The Thomas Fletcher, 24 Fed. Rep. 377; The G. F. Brown, 24 Fed. Rep. 400; The Ellen Holgate, 30 Fed. Rep. 126; The Menominie, 36 Fed. Rep. 198.]

3. The Albany was owned at the town of Boscobel, in Wisconsin, and was enrolled at Galena, in Illinois, the nearest collector's office to the residence of the owner: necessary supplies were furnished by the libellant to the vessel at La Crosse, in Wisconsin: Held, that the libellant was not entitled to a maritime lien on the vessel.

[Cited in The Mary Chilton, 4 Fed. Rep. 848; The Rapid Transit, 11 Fed. Rep. 329.]

[Appeal from the district court of the United States for the district of Minnesota.]

In admiralty. A libel in rem was filed in the United States district court for Minnesota, in August, 1875, to enforce a maritime lien for necessary material and supplies furnished by the libellant to the Albany, at the request of the master. These were so fur-

[1][Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

nished by libellant in 1873, at La Crosse, in the state of Wisconsin, where the libellant resided and did business. The owner of the Albany was then, and still is, one Jacob Heime, who resided at Boscobel, in the state of Wisconsin. Boscobel is within the collection district which has its collector's office at Galena, Illinois, where the said Albany was enrolled and licensed, and Galena is the nearest collector's office to Boscobel. The Albany was engaged in navigating the Mississippi river, and during the winters she regularly laid up at Boscobel. She has painted on her stern, as required by the act of congress, the words, "The Albany, Boscobel, Wisconsin." In 1875, the Albany was mortgaged to certain of the claimants, whose mortgages were duly registered just before the seizure of the boat. The mortgagees had no notice of the libellant's claim. The Albany has been at the port of La Crosse as often as once a month during each season of navigation, since the libellant furnished said materials and supplies. There were two main questions argued in the district court: 1. Has the libellant a maritime lien? 2. If so, is the same stale as respects the mortgagees? The district court entered a decree in favor of the libellant. The owner and mortgagees appeal. [Decree reversed and libel dismissed.]

W. P. Warner, for claimants, (appellants.)
J. H. Davidson, for libelant, (appellee.)

DILLON, Circuit Judge. The decisive question in this case is, what was the home-port or state, of the steamboat Albany? It is a question of very great importance, and in respect of which some conflict of judicial opinion appears to exist. It has been deliberately considered, and without spreading upon this opinion all the learning applicable to it, I proceed to state my views concerning it. As strengthening the conclusion arrived at, and illustrating the reasons upon which it is based, it is desirable, briefly, to advert to the general law upon the subject of maritime liens or hypothecations. By the civil law, the material-man, for repairs made or necessary supplies furnished to a vessel, had an implied or tacit lien, whether the vessel was in her home-port or in a foreign port. Abb. Shipp. 142; The Lottawanna, 21 Wall. [88 U. S.] 590, 2 Cent. Law J. 410. And such is the undoubted rule in the maritime nations of Europe, which have adopted the civil law as the basis of the jurisprudence. It is equally well known that this principle has not been adopted as the law of England, or, rather, after having obtained in the admiralty courts of that country for some time, it was overturned by the hostility of the common law courts. The Zodiac, 1 Hagg. Adm. 325.

In the present case, the supplies were furnished to the vessel at the instance of the master, and in the maritime law of Europe

certain limitations upon his power, as between him and the owner, in respect of contracts for supplies or money to obtain them, are declared to exist.

By the celebrated marine ordinance of Louis XIV., whose provisions have been largely embodied in the Code de Commerce, material-men furnishing supplies are entitled to a lien; but this right is subject to the qualification (article 232, Code de Commerce) that the master shall not, in the place of residence (dans le lieu de la demeure) of the owners or their agent, without special authority, cause repairs to be made, buy sails, cordage, etc., or take up money for that purpose. But if the master violate this duty, the material-man, acting in good faith, is not deprived of his right or remedies. The words, "the place where the owner resides," are construed in France to comprehend the whole district, but not the whole country. Selden v. Hendrickson, (The Richmond,) [Case No. 12,639.] But in England there is no implied lien recognized for repairs made or supplies furnished in that country—the principle of the civil law in this respect having been, as above observed, overthrown by the early hostility of the common law courts to the admiralty jurisdiction. But for necessary repairs made and supplies furnished abroad or in a foreign port, the English courts recognize and enforce a maritime lien.

It is important to notice the reasons given in the English courts for this distinction. Lord Mansfield says: "Work done for a ship in England, is supposed to be on the personal credit of the employer"—the owner or master. "In foreign ports," he adds, "the master may hypothecate the ship." Wilkins v. Carmichael, 1 Doug. 101. And, finally, the house of lords, in 1789, to conform the law of Scotland to the law of England, in Wood v. Hamilton, [3 Pat. App. 148,] decided that persons who had repaired and furnished a ship in Scotland, the place of the owner's residence, had no lien or privilege upon the ship itself. Abb. Shipp. c. 3, pt. 2, p. 147.

A maritime lien for supplies and necessary repairs abroad, furnished at the instance of the master, the owner being absent, is allowed from necessity and the encouragement of trade. Abb. Shipp. 144, 145.

The question in England, as to what is the place of residence of the owner, has given rise to controversy; but Lord Tenterden says: "I apprehend the whole of England is considered, for this purpose, as the residence of an Englishman; at least before the commencement of the voyage." Abb. Shipp. 155; Selden v. Hendrickson, [Case No. 12,639,] where the subject is discussed by Chief Justice Marshall. But the question is now settled in Great Britain by statutable provision. By 19 & 20 Vict. c. 97, § 8, all ports within Great Britain and Ireland, the Channel Islands, and the islands adjacent, if part of the queen's dominions, are to

be deemed home-ports in relation to the rights and remedies of persons having claims for repairs done or supplies furnished to ships.

Such being the state of the law in Europe and England, it became a question in the admiralty courts in this country, soon after their creation under the constitution, what doctrines they would adopt in respect of repairs and supplies. Some followed the more enlarged right given by the continental or general maritime law; others the more restricted right recognized by the English courts. In this condition of the law, at home and abroad, the supreme court of the United States, in 1819, decided the case of The General Smith, 4 Wheat. [17 U. S.] 438. In that case a Baltimore merchant furnished supplies to the ship General Smith, which was owned at Baltimore, and the court decided that there was no lien upon the vessel. In delivering its judgment, Mr. Justice Story thus states the doctrine of the court: "Where repairs have been made or necessaries have been furnished to a foreign ship, or to a ship in the port of a state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for his security. But in respect to repairs and necessaries in the port or state to which the ship belongs, the case is governed by the municipal law of that state, and no lien is implied, unless it is recognized by that law." The case of The General Smith has been frequently approved by the supreme court, and in the recent case of The Lottawanna, 21 Wall. [88 U. S.] 558, it has been solemnly reaffirmed, with but two dissenting judges. In applying the rule of The General Smith in other cases, the following language, bearing upon the question in the case under consideration, has been used: "Material-men who furnish materials or supplies for a vessel * * in a port other than a port of the state where the vessel belongs, have a maritime lien on the vessel" therefor. The Belfast, 7 Wall. [74 U. S.] 643, per Clifford, J. But not "for materials and supplies furnished to a vessel in her home-port." Id. 645. "A maritime lien does not arise for repairs made and supplies furnished in the home-port of the vessel." This "question was put at rest" by The General Smith, 4 Wheat. [17 U. S.] 443. Per Clifford, J., in The Kalorama, 10 Wall. [77 U. S.] 211; People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393, 402.

We are thus brought to the question in the present case, whether the Albany, within the doctrine of the supreme court, belonged to the state of Wisconsin, where her owner resided, and to which she purported to belong, by the words painted upon her stern, or belonged to the state of Illinois, in which she was enrolled. Or, in other words, which is the home-port? 1. Is it the particular town or city in a state in

which the owner resides, and is every other port in the state, as well as elsewhere, foreign? 2. Is the vessel at a home-port at all ports in the state in which her owner actually resides, although she may be enrolled in another state? Or, 3. Does the state in which the enrollment is made conclusively determine the home-port or domestic character of the vessel, irrespective of the residence of the owner?

To solve the questions, let us first seek the aid of adjudged cases. In The Nestor, [Case No. 10,126,] A. D. 1831, on which a lien for supplies furnished in the District of Columbia for the Nestor, belonging to the port of Portland, Maine, was sustained, Mr. Justice Story said: "The admiralty has a clear jurisdiction to maintain such suits whenever the supplies have been furnished to the vessel in a foreign port; and every port is foreign to her which is not in the same state to which she belongs. So the doctrine was laid down in the case of The General Smith, and it has never, to my knowledge, been in the slightest degree departed from." "Ports of states, other than those of the state where the vessel belongs," says Clifford, J., "are considered as foreign ports." The Lulu, 10 Wall. [77 U. S.] 200, 202. "The term 'foreign port' in the jurisprudence of the United States," says the same learned judge, in a case on the circuit, "includes all maritime ports other than those of the state where the vessel belongs." Burke v. The Richmond, [Case No. 2,161.] And see the same illustration put by the same judge in the case of The Lottawanna, 21 Wall. [88 U. S.] at page 594.

The language of the opinion in the case of The General Smith and of Mr. Justice Story and Mr. Justice Clifford, above referred to, fairly implies, I think, that the domestic or foreign character of the vessel is determined by the state in which the owner resides, and not by the state in which the enrollment is made. And decided cases, —The General Smith, [4 Wheat. (17 U. S.) 438;] The Nestor, [Case No. 10,126;] The Chusan, [Id. 2,717,]—in the statement of them, show that the residence of the owner was regarded, and not the enrollment.

In the case of The Golden Gate, [Id. 6,492;] decided by an able admiralty judge, the precise question was presented, whether the foreign or domestic character of a vessel depended on the residence of her owner, or on the port of her enrollment. Judge Wells decided that where these were different, the residence of the owners governed as respects the rights and remedies of material-men. And the same reason is given by him as the one which is supposed to underlie the rule in this country denying a maritime lien for supplies to a domestic vessel. Judge Wells says: "If the owners reside in a foreign country, or in another state, the material-man is presumed to give credit to the boat and also to the owners— because he is not presumed to rely alone on the owners who live so remote and who are beyond the jurisdiction of the courts of his state. If the owners reside in the same state with the material-man, the latter can easily resort to them for payment and readily enforce it in the courts; therefore he may well be supposed to give credit to the owners alone. It is apparent, therefore, that the place of enrollment has nothing to do with the credit that is given; and has, therefore, nothing to do with the question of lien."

A similar principle was approved and applied by Judge Leavitt, in the case of The Superior, [Case No. 4,115.] He holds that the place of enrollment is only prima facie evidence of the port or state to which the vessel belongs, and denies the soundness of The Indiana, [Id. 14,165,] so far as it decided that the vessel necessarily belonged to the port where she is enrolled.

The exact question whether the home-port of a vessel is determined by the residence of the owner or the place of enrollment. arose in The Mary Bell, [Case No. 9,199,] and it was decided by Judge Deady that the state in which the owner resided, and not that in which the enrollment was made, governed. Judge Betts made a similar decision in the southern district of New York. The Kosciusko, [Id. 13,901.] And in The Alida, [Id. 199,] this learned judge says: "Where services or supplies are rendered to a foreign ship, a lien attaches by the general maritime law, and the different states of the federal Union are, in regard to this question, regarded as foreign states to each other." This conclusion accords with the views of Chief Justice Marshall, in Selden v. Hendrickson, [Case No. 12,639,] 1819, where, after stating the law of England, he says: "The same principle applied to the United States, requires, I think, that a port in one state should not be considered as the place of residence of owners who live in another state." * * * "If every port, except that in which the owner actually resides, be not for this purpose (the hypothecation of the vessel) a foreign port, I perceive no rule more proper in this country, no rule better adapted to our situation, and to the reason of the thing, than to say that the power of the master to hypothecate exists in every port out of the state in which the owner resides, where he has no agent."

I am aware that in The Loper, [Case No. 11,119,] A. D. 1851, Mr. Chief Justice Taney is reported as laying down a contrary doctrine, and as saying: "The circumstance that the owner or charterer (of the Loper) was a citizen of another state, would not make her a foreign vessel in the port of Baltimore; the port at which she was enrolled and licensed was her home-port. As she belonged to Baltimore, and the supplies were furnished here, they were furnished at her

home-port, and created no lien upon the vessel. This question was directly decided in the case of The General Smith." And this is all of the opinion of the chief justice on this point. He enters into no reasoning, and although great weight is due to every expression of this eminent judge, I think it manifest, from the opinion itself, that his attention was not called to the considerations affecting the question, and that he acted upon the supposition that the case was controlled by The General Smith, and decided it by simply citing and following the judgment of the supreme court.

A still different view has been taken as to what constitutes the home-port of an American steamboat engaged in inland navigation, by Judge Deady, in the case of The Favorite, [Case No. 4,699,] which was enrolled in Oregon, and whose owner resided at the place of enrollment. The learned judge, after remarking that, "under the ruling of The Lottawanna by the supreme court, what constitutes the home-port is yet an open question," says: "I think, upon reason and convenience, the home-port ought to be the one where the vessel is enrolled. Away from that place, whether in or out of the state where her owner resides, she is supposed to be in itinere, and therefore relying upon her credit for the purchase of supplies to continue the voyage." And he held that material-men residing in Oregon were entitled to a maritime lien, if they resided at a town or port in the state different from the one where the owner resided and the boat was enrolled. I do not think the judge intended to overrule his decision in the case of The Mary Bell, supra, and however convenient the doctrine he held would be, and however desirable it might be deemed as limiting the doctrine of The General Smith, denying a lien upon domestic vessels, I have not been able to persuade myself that it is consistent on this point with the judgments of the supreme court.

All of the adjudications in respect to the rights and remedies of material-men, since the case of The General Smith, have proceeded, I think, upon the notion that vessels owned in the state where the credit was given are to be considered as domestic vessels, and there is in such cases no maritime lien; if owned without the state there is a maritime lien, and I shall decide this case upon the assumption that this view is the one we are required to take by the decisions of the supreme court.

I have not discussed the question upon principle. It were profitless to do so. I content myself with the observation that it would doubtless have been better, in view of our local situation, if the supreme court had adopted the rule of the general maritime law, recognizing a lien for proper repairs made and supplies furnished on the credit of the vessel, without respect to the states in which the creditor and owner of the vessel reside. The doctrine of the supreme court, which it is safe to say would never have been adopted if the court could have had the benefit of the reflected light of subsequent experience, when applied to vessels navigating on lakes and inland waters, traversing several states, has produced, and if it remains will continue to produce, confusion, inconvenience, hardship, and injustice between creditors equally meritorious. But the supreme court, in The Lottawanna, in the face of an unanswerable dissent, stands by, rather than vindicates, the doctrine of The General Smith, discriminating between the rights and remedies of domestic and foreign material-men. The inferior courts must accept its exposition of the law as authoritative until that tribunal changes its judgment, or congress shall, as in my judgment it ought, make that provision for domestic creditors which is so ineffectually provided by the boat laws of the different states.

My understanding of the decisions of the supreme court as to the rights and remedies of material-men, lead me in this case to these conclusions:

1. That the Albany "belonged" to the state of Wisconsin, and that every port in that state was, as respects material-men, the home-port of the vessel. The libellant, residing in and extending credit in that state, is, under the view of the supreme court, conclusively presumed to have extended it to the owner, who resided in the state, or to the master, and has no implied or maritime lien on the vessel.

2. That as respects the rights and remedies of material-men, the home-port or state of a vessel is the state wherein the owner resides, and not the state or district in which she is enrolled, where the two are different. To hold in such a case that the enrollment controlled, would destroy the only foundation upon which a distinction between the rights of domestic and foreign material-men has been made, viz.: that the former are presumed to extend credit to the owner, whom they are supposed to know, or whom, at all events, they may pursue in the courts of their own state. The St. Lawrence, 1 Black, [66 U. S.] 527; The Lottawanna, 21 Wall. [88 U. S.] 593. The decree of the district court is reversed, and a decree will be here entered dismissing the libel at the costs of the libellant. Decree accordingly.