Moody, J.
In July, 1879, James Bees filed his libel in the District Court for the Second District,” claiming a maritime lien upon the steamboat General Terry, for work and labor done and materials furnished in the alleged construction and repair of said steamboat, at Pittsburgh, Pa., in the winter and spring of 1878.
*158 On the same day Blatt & Buerdorf filed their libel in said court claiming a lien for groceries and supplies furnished the T$rry, at Yankton, Dakota Territory, in the spring of 1879.
The two libels were consolidated and tried together in the District Court — the testimony being separately preserved- — and after the hearing that court dismissed both libels, upon the ground that neither libellant had a maritime lien upon the said steamboat, and the libellants appeal to this court.
Two questions only are raised and argued here. One is applicable to the libel of James Rees, and involved the inquiry, What constitutes a building contract? The other relates to the libel of Blatt & Buerdorf, who furnished supplies to the Terry at what the claimants contend was the home port of the vessel.
A small item included in the libel of James Rees, is also for supplies furnished by him for the Terry, at Bismarck, Dakota Territory, the question regarding which is the same as that presented in the case of Blatt & Buerdorf. The facts found by the District Court, relating to’ the libel of James Rees, and which are affirmed by the court, so far as they form a basis for our determination are, in substance, these:
In the winter of T878, Walter A. Burleigh, one of the claimants, and other persons, conceived the purpose of building, at Pittsburgh, Pa., for navigation upon the upper Missouri river and its navigable tributaries, a steamboat, to be called when built, the “ General Terry.”
In carrying out such purpose they contracted with one person, ,or firm, to build the hull; with another to construct the machinery with which the steamboat was to be propelled, and with others for the cabin and upper works. James Rees, the libellant, was the contractor for the machinery. The hull was constructed at a point about twenty miles below Pittsburgh, and after being launched was towed to Pittsburgh, where the machinery was put in by Rees, *159 •and the steamboat completed. Mr. Rees was thoroughly familia» with all the details of the transaction, and the purpose of the parties from the outset, his son being one of the owners, and himself superintending the construction of the boat, and taking a lively interest in its success. In March, 1878, after being duly, temporarily, enrolled at Pittsburgh, as by law required, the Terry was taken to Yankton, Dakota Territory, and thereafter used in the navigation of the Upper Missouri and Yellowstone rivers.
As will hereinafter be more particularly noticed, the port of Pittsburgh, Pa., was after the completion of the General Terry, a port foreign to her, so that with reference to the libel of James Rees for the machinery furnished in her construction at Pittsburgh,' the question of home port does not arise.
It may be considered as the settled law of admiralty in this country, since the decision of the Supreme Court of the United States in Peoples’ Ferry Company v. Beers, 20 How., 393, that under a building contract no maritime lien can be maintained. But the contention here is, that inasmuch as the hull of the steamboat was built at another place, there launched, and thence towed to Pittsburgh for completion, the libel of Rees can be sustained, upon the theory that the labor he performed, and materials he furnished, were in the nature of repairs, for which a lien is given.
At the time the hull was launched it was neither a steamboat, a barge, a lighter, a scow, nor a vessel of any description for navigation, either by its own means of propulsion, or by means of any ether power. It was merely the hull of a steamboat in process of construction, toward which construction the libellant contributed, by furnishing the engines, boilers and machinery. Neither was it the case of a vessel once constructed, thereafter wrecked, or partially burned, and reconstructed and repaired. Nor was it machinery of a former vessel used upon a new hull. The steamboat as an entirety was constructed partially by the libellant, and in part by others.
*160 It would seem that the case of Roach & Long v. Chapman et al, 22 How., (U. S.) 129, was decisive of this appeal. In that case the libellants had furnished at Louisville, Ky., the engines, boilers, and machinery for the steamboat Capitol, in her construction. The court say: “A contract for building a ship or supplying “ engines, timber or other material for her construction, is clearly “ not a maritime contract.” “ Any former dicta or decisions “ which seemed to favor a contrary doctrine were overruled by this “ court in the case of the Peoples' Ferry Co. v. Beers,” 20 How., 393.
It does not directly appear, from the facts reported in that case, whether the boilers and machinery were furnished and put into the steamboat before, or after, the hull was launched. In-the nature of the transaction it must have been afterwards. It is a matter of common observation that machinery of this character is not put upon a steamboat, until after the hull is launched. And if once upon the water it can make no difference, in principle,whether the hull lies moored where it left the ways, or was towed one rod, or twenty miles, for the purpose of receiving the machinery and the completion of the vessel.
The dividing line between the existence and non-existence of the maritime lien is, where construction’ ends and repairs commence, and the fact of the boat, or its completed parts, being upon the water, is only an incident to be taken into account, in determining whether the labor and materials were in the repair of the vessel, or in its construction.
A rule which would deny the right of maritime lien to the man who furnishes the materials for, and performs the labor upon a steamboat in her construction, while the hull is still upon the ways, and allows such lien to the person who puts on the additional planks to complete the hull, who places thereon the superstructure, and who furnishes and attaches thereto the machinery *161 intended for her propulsion, and necessary to create, complete and constitute her a steamboat, after the hull has slid from the ways into the water, would be a rule without a reason, as applied to the business of constructing steamboats for use upon the inland navigable waters of this country, and all the learning bestowed upon the admiralty branch of the law, could not commend it to us for fairness or sound sense. It frequently occurs that steamboats are drawn out of the water upon ways, for repairs, after having for some time been engaged in navigation. It would hardly be claimed that repairs thus made “ upon land ” were not in a proper case a lien upon the vessel.
The mere launching of the hull of an uncompleted steamboat, cannot give to the builder thereafter engaged in her construction, the lien of the maritime law.
The principles upon which the maritime lien is founded preclude its application to the construction of a vessel. The most familiar of those principles is, that by giving this preference and priority, this interest in the thing, it enables the master upon the credit of the vessel to obtain in the foreign port the supplies and repairs necessary to enable the vessel speedily to prosecute her voyage, and by that means the delay and expense required to communicate with the owner or charterer are avoided. This fosters, protects and encourages commerce, by giving security to the stranger who aids the vessel in her necessities, away from her home, and where the credit of her owners is unknown. By the master’s act, and by reason of the necessity alone does this lien attach. So that where the owner is present, no lien is acquired “ by the material-man, nor is any when the vessel is supplied or “ repaired in the home port. The lien attaches to foreign ships * and vessels only in favor of the carpenter who repairs in. a case “ of necessity, and in the absence of the ownei\ It would be a “ strange doctrine to hold the ship bound in a case where the “ owner made the contract in writing, charging himself to pay *162 “ installments for building the vessel at a time when she was “ neither registered nor licensed as a sea-going ship:” Steamboat Jefferson, 20 How., 402. While the vessel is building she has no home port, and no port is foreign to her. She is without name, enrollment, crew, or master. She is not engaged in commerce, and has no necessities.
The builder may secure himself by his agreement with the owners, by the lien of the local law, if one is given, or by the common law lien dependent upon possession. The repairer can have no common law lien, as the vessel is in the legal custody and possession of the master.
In accordance with numerous adjudications, no doubt a vessel of any character of sufficient tonnage to come within the rules in admiralty, which is used for the purposes of commerce and navigation upon any of the waters within the admiralty jurisdiction, whether such vessel be propelled by steam or other inherent power, by means of appliances with which the winds are utilized, by the currents of the water upon which it floats, or by other and extrinsic power, may be the subject of maritime liens for repairs, and such liens may be enforced whether such repairs be insignificant or amount to a complete reconstruction of the vessel, or an entire revolution in its mode of propulsion. But we find no adjudicated case which places- a • transaction such as in the case at bar, among the repairs of a vessel, and it is as we have seen for repairs and not for the creation of a vessel that the admiralty lien is given.
The contract under which the libellant, Rees, furnished the machinery and performed the labor was strictly a building contract, and therefore no lien is given him by the maritime law, and he claims none other.
The facts applicable to the claim of Blatt & Buerdorf, are as follows: Subsequent to the temporary enrollment at Pittsburgh, heretofore spoken of, the General Terry was not enrolled until *163 after her seizure and sale under these libels. To comply with the act of Congress she ought to have been permanently enrolled at Omaha, Nebraska, which was the port of entry nearest to the residence of her owners, who resided at Yankton, Dakota Territory, and such enrollment should have taken place upon her arrival at Omaha on her way to Yankton. For some unexplained reason, in her temporary enrollment papers she was designated as “of Omaha,” but as the law requires shall be done, there was painted upon her stern, the place at which she was claimed as belonging, to-wit, “ General Terry, of Yankton, D. T.”
About one year after the Terry had been completed and in the spring of 1879, at Yankton, Dakota Territory, the libellants, Blatt and Buerdorf furnished, for the use of the steamboat, certain groceries, provisions and other boat stores, to be used by her crew and passengers upon an intended voyage up the Missouri and Yellowstone rivers. At the time these stores were furnished, the Terry, was lying moored to the shore at Yankton. The majority of her owners then resided at Yankton, as did Walter A. Burleigh, her managing owner. Burleigh had alwaj^ been her managing owner, and during the prior season of navigation, was her master, had been enrolled as such in the temporary enrollment, andnoonehad been substituted for him in that capacity, although when these supplies were furnished, preparations for a voyage were being made, and when she departed, it was with another person as master.
We assume for the purposes of this decision, although the evidence in the transcript led us to seriously question that fact, that •these supplies were furnished by Blatt & Buerdorf upon the credit of the boat. They however, well knew where the steamboat was owned, who were the owners, that such owners, and the managing owner, Burleigh, resided at Yankton, and were of sufficient credit to obtain all needed supplies without resorting to the expedient of pledging the steamboat.
*164 We also assume that the supplies thus furnished were necessary to enable said vessel to proceed upon her intended voyage.
Upon the part of the libellants, Blatt & Buerdorf, the contention is that the home port of the vessel, is that port where she was or ought to have been enrolled, and which is nearest to the residence of her' owners; that such port being Omaha, it was her home port, and when the Terry was at Yankton, she was in a foreign port, within the meaning of the maritime law, and for necessaries there supplied upon the order of her enrolled master, Burleigh, a maritime lien attached.
Singular it is, but true, that the question as to what constitutes the home port of a steamboat engaged in the navigation of the inland waters of this country, cannot yet be said to be definitely settled, notwithstanding the lapse of so many years since the doctrine of the maritime law was extended to those waters beyond the ebb and flow of the tides.
Judge Deady, in the case of the “Favorite 3 Saw., 411, uses “ this language: “Under the ruling of the Lottawana, lately de“cided by the Supreme Court (21 Wal., 558,) Avhat constitutes a “ home port, is yet an open question. But I think upon reason “ and convenience, the home port ought to be the one where the “ vessel is enrolled; away from that place, whether in or out of “ the state in Avhich her owner resides, she is supposed to be in “ itineve, and therefore relying upon her credit for the purchase w of the necessary supplies to complete her voyage.”
Judge Dillon, in the case of the “Albany” 4 Dill., 439, after quite an extended discussion and review of the authorities upon this subject, concludes: “My understanding of the decisions of the Supreme Court, as to the rights and remedies of material men, lead me in this case to these conclusions:
“ 1. That the Albany “belonged” to the state of Wisconsin, and that every port of that state was as respects material men, the *165 home port of the vessel. The libellant, residing in and extending credit in that state, is, under the view of the Supreme Court, conclusively presumed to have extended it to the owner, who resided in the state, or to the master, and has no implied or maritime lien on the vessel. ”
“ 2. That as respects the rights and remedies of material-men, the home port or state of a vessel, is the state wherein the owner resides, and not the state or district in which she is enrolled, when the two are different. To hold in such a case that the enrollment controlled, would destroy the only foundation upon which a distinction between the rights of domestic and foreign material-men has been made, viz.: that the former are presumed to extend credit to the owner, whom they are supposed to know, or whom, at all events, they may pursue in the courts of their own states. ”
In the case of the “Albcrny,” the vessel was enrolled at Galena, in the state of Illinois. The supplies were furnished at La Crosse, in "Wisconsin, and the owners resided at Boscobel, Wisconsin. The libel was dismissed for want of jurisdiction.
After an examination of all the cases upon this subject within our reach, we are satisfied the clear weight of authority, as well as the effect of the decisions of the Supreme Court of the United States, is with the doctrine that the home port of a vessel is any port of the state or territory where the owner, or if more than one, where the managing owner resides, so far as the question of home port affects the rights and remedies of the material-men.
Some discussion was had in this case, as to what constitutes a port within the meaning of the terms, home and foreign ports.
It must be held that a port upon the Missouri river is any place where steamboats may land with safety, and lie moored to the shore, and not merely those places designated by acts of Congress as ports of entry and for other purposes.
*166 We have not felt ealled upon to discuss the effect of furnishing upon credit supplies to a vessel in her home port.
Since the decision of the Supreme Court in the “ General Smith ” 4 Wheat., 438, it has been the settled law of this country that for supplies furnished a domestic vessel at her home port, the material man has no maritime lien.
The libellants, Blatt & Buerdorf, having furnished the supplies for which they claim a lien to the General Terry, at Yankton, while she lay moored to the levee at that place, and Yankton being the home-port of the Terry, by reason of the managing owner and a majority of her ownership residing there, it follows that they have no admiralty lien upon said steamboat, and therefore their libel must be dismissed.
It was suggested that some distinction may exist or be found between this and other cases upon the subject of the home-port, by reason of the residence of the Terry owners being in a territory, the cases examined speaking usually of the ports of the same state. We think the word state, as used, refers to the jurisdiction, and not merely to a sovereignty, and cannot have greater significance than would the word j urisdiction, or country, or territory. So far as the running of process, the facility for enforcing the claims of material-men against resident owners, a territory is as much of a sovereign, is as separate a jurisdiction, and possesses as much power as a a state.
At all events, it can hardly be with reason urged that a vessel at a port in a territory where its owner resides, is in a foreign port, merely because the territory is subject to the jurisdiction of Congress, and does not possess the attributes of state sovereignty. A more plausible argument might be, that, inasmuch as the territory belongs to the people of all the states, no port in any state is foreign to a vessel owned in a territory.
As before stated, a small item in the libel of James Rees, is for *167 material used for repair of tbe steamboat, wbicb were furnished upon tbe order of Burleigh, tbe managing owner, and were shipped to, and taken upon tbe boat at Bismarck. Haying held that any port within tbe territory of Dakota was a home-port of this steamboat, General Terry, that disposes of this item without tbe necessity of further notice.
Tbe judgment and decree of the District Court dismissing the libels with costs is
Affirmed.
All tbe Justices concurring.