THE THOMAS FLETCHER, (on the Appeal of James Gibb Ross.)[1]

*(Circuit Court, S. D. Georgia.* November, 1884.)

1. MARITIME LIENS—BOTTOMRY BONDS.
    A bottomry bond should have a preference to be paid out of the proceeds of a vessel, superior to those holding maritime liens for supplies and repairs, if the evidence shows that prior to its execution the owner of the vessel was notified to consent to the bond, or to raise the necessary funds by other means. *The Julia Blake*, 16 Blatchf. 472, followed.

2. SAME—SUPPLIES.
    To constitute maritime liens for supplies, they must have been furnished on the credit of the vessel, and in some other than her home port.

3. SAME—HOME PORT.
    The enrollment of a vessel makes only a *prima facie* case as to the port of her enrollment being her home port, which may be overcome by evidence as to the residence of her owner. The statute (Rev. St. § 4141) provides that the home port of a vessel "shall be deemed to be that at or nearest to which the owner usually resides," and that seems to contemplate that a ship-owner may reside in different places; but the residence to determine the place of enrollment (or home port) is to be the usual residence, and no person can have more than one such residence. Business men in this country may have residences and business places scattered over the whole of our great territory, but, as a matter of fact, they cannot have more than one usual residence.

Admiralty Appeal.

*Richards & Heyward*, for appellant.

*Garrard & Meldrim*, for appellees.

PARDEE, J. The bark Thomas Fletcher having been sold by decree of the district court, and the proceeds of sale partitioned among the various libelants and intervenors, James Gibb Ross, a mortgage

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

creditor of said bark, appeals.   The pertinent facts are about as follows:   Pendergast lived at Plainfield, in the state of New Jersey, and had a business place in the city of New York.   He was the owner of the bark Thomas Fletcher, which he caused to be enrolled in the port of New York, although Perth Amboy was the nearest port having a custom-house.   The libelants, Richard Poillon, George Bell, Willett & Hamlin, and McCaldin Bros., furnished supplies and materials for repairs to the Fletcher in the port of New York, for which they respectively claim a maritime lien.   Richard Poillon and George Bell each furnished supplies on the order of Pendergast and the master; each now swearing that the supplies were furnished on the credit of and charged to the vessel, and that they knew that Pendergast resided at Plainfield, New Jersey.   In further proof that the supplies were credited to the ship, it appears that, within a few days after furnishing, each filed a lien against the Fletcher under the lien laws of the state of New York.

The supplies furnished by Willett & Hamlin were at the request of the owner, Pendergast, on the credit of the ship, as sworn by libelants' agents.   The supplies furnished by McCaldin Bros. were furnished on the order of Pendergast, and whether the ship was credited does not appear.   It does not appear that either firm knew of Pendergast's residence.   Nor does it appear that any of the libelants knew that Pendergast had a place of business in New York city.   The libel of James Gibb Ross, assignee, is on a bottomry bond, executed in Falmouth, England, in favor of W. H. Ross & Co., and the only point made against it is that the evidence does not show that prior to its execution the owner, Pendergast, was notified, as he might have been, to consent to the bond, or to raise the necessary funds by other means.   This being a contest among creditors for priority, and the owner, Pendergast, not appearing, it is claimed that, although Pendergast is bound, the contesting libelants are not bound by the bond. The only evidence bearing on the point of notice to Pendergast is that of libelant himself, who, in testifying of Pendergast's attempting to borrow money from him, says:

"The repairs done at Falmouth on the Thomas Fletcher were not done on the strength of my credit with W. H. Ross & Co.   The repairs were made, and the money to pay for them raised on bottomry, by the master of the vessel, before W. H. Ross & Co. received notice from me that I was willing to advance the money.   I was in communication with Pendergast at the time the Thomas Fletcher was at Falmouth.   At that time he was in New York city.   Part of the time I was in New York, and part of the time I was in Quebec.   Pendergast wished to raise money for the Thomas Fletcher's repairs, and asked me to advance the funds.   I was not disposed to do so, as I considered that the vessel already owed me all she was worth.   I advised W. H. Ross & Co. that Pendergast was not able to pay or raise the money.   Pendergast afterwards asked me again to advance funds, and offered me as security the order for $3,000 of the Fairy Belle's freight.   It was then that I advised W. H. Ross & Co. that I was willing they should advance funds to pay for the Fletcher's repairs, and charge same to my account; but, as I have already

THE THOMAS FLETCHER. 377

stated, the money to pay for the repairs had been raised on bottomry before W. H. Ross & Co. received my letter."

If it is deemed material to show that the owner was communicated with before the bottomry bond was given, (see *The Julia Blake*, 16 Blatchf. 472 *et seq.*,) then it appears from the above-quoted evidence that he had notice, and was unable to raise funds in time to meet the necessity. James Gibb Ross also intervenes in this case, to claim proceeds of sale of the Fletcher as the holder of a mortgage for the sum of $10,000, which mortgage purports to have been executed by Pendergast of Plainfield, New Jersey, sole owner of the Fletcher, and was recorded in the office of the collector where the Fletcher was enrolled, November 30, 1880.

It seems clear, in ranking these claims, that the bottomry bond should be recognized and given priority. If the demands of the various libelants for supplies and repairs are maritime liens, they should rank next. If not maritime liens, they should be rejected entirely, for they are not shown nor claimed to be domestic liens. To constitute them maritime liens, the supplies must have been furnished on the credit of the ship, and in some other than the home port of the ship. See *The Lottawanna*, 21 Wall. 559; *Stephenson* v. *The Francis*, 21 Fed. Rep. 715, and the numerous cases there cited.

From the evidence submitted, it is apparent that, of these materialmen, Poillon, Bell, and Willett & Hamlin gave credit to the ship. The evidence is not as strong as it might perhaps have been made; but, uncontradicted, it is sufficient. The supplies furnished by McCaldin Bros. seem to have been on the naked order of Pendergast, owner, then present. As to what port is the home port of an American ship, there arise many very difficult questions. When the residence of the owner is in the same state as the nearest port to such residence, and there is no other port in the state, there is no particular trouble in ascertaining the exclusive home port, provided the ship is enrolled at the proper port; but, if all these circumstances do not concur, the home port of a ship is a matter of uncertainty, under the authorities, the weight of authority being in favor of considering all the ports of the state in which the owner resides as home ports. See *The Albany*, 4 Dill. 439, and cases there cited. In the present case, the question is whether the port of New York was, at the time the supplies were furnished, a home port of the Fletcher.

It is conceded that the enrollment of the Fletcher in New York makes only a *prima facie* case as to that being her home port. That *prima facie* case seems to be overcome by the positive evidence that Pendergast lived in New Jersey, and that Perth Amboy was the proper place for his ship to be enrolled. But then it is contended (see *The Albany, supra*) that as Pendergast had a continuous business place in New York, where he was nearly always to be found during business hours, that New York constituted his residence, in the sense of section 4141, Rev. St., relating to enrollment.

Without reviewing the authorities cited to maintain this proposition, I do not think it necessary to go further in this case than the language of the statute itself, which is: "which port shall be deemed to be that at or nearest to which the owner   *   *   *   usually resides." For certain commercial purposes a person's usual place of business may be taken for his residence, not because he resides there, but because he may, or ought to be found there; and the statute referred to seems to contemplate that a ship-owner may reside in different places, for the residence to determine the place of enrollment is to be the usual residence, and no person can have more than one such residence.    Pendergast may have had a residence in New York at his business place, but it was not his usual residence.    His usual residence was at Plainfield, New Jersey, where he kept his family, and where he lived continuously from 1878 to 1884, perhaps going to New York city the morning of every business day, and returning to his home at night.    Business men in this country may have residences and business places scattered over the whole of our great territory, but I cannot see how, as a matter of fact, they can have more than one *usual* residence.    At all events, I am clearly of the opinion that, under the evidence in this case, Pendergast's *usual* residence was at Plainfield, New Jersey, and not in the city of New York.    In reaching this conclusion I do not hold that Pendergast, by his conduct, may not be estopped on the matter of residence; and this might be a very important question in this case if any of the libelants herein were adjudged to have, not maritime liens, but domestic liens under the laws of New York.

The conclusions on the whole case are that a decree should be entered recognizing the bottomry bond as being first entitled to be paid out of the proceeds of the sale of the bark Thomas Fletcher; that the demands of Richard Poillon, of George Bell, and of Willett & Hamlin be recognized as maritime liens, and ordered to be next paid—*pro rata*, if necessary—out of said proceeds; and that thereafter the claims of James Gibb Ross, under his mortgage, be next allowed and paid; any balance of said proceeds to remain in the registry of the court. The demand of McCaldin Bros. to be adjudged no lien, and to be dismissed.    The costs incurred on the libel of McCaldin Bros., in the district court, to be paid by said McCaldin Bros.    All the other costs of the district court to be paid from the funds in the hands of the court.    The costs of this court, including transcript, to be paid out of the fund, if any remain, after satisfying in full the demands of Poillon, Bell, and Willett & Hamlin; otherwise to be divided (if nothing remain after satisfying such demands) between James Gibb Ross, who shall pay three-fourths, and McCaldin Bros., who shall pay one-fourth.