## THE ELLEN HOLGATE.[1]

### McLEAN and others *v.* THE ELLEN HOLGATE.

#### (*District Court, D. New Jersey.* February 1, 1887.)

1. MARITIME LIENS—MATERIAL-MAN—HOME PORT.

It is difficult to formulate a precise rule by which the home port of a vessel belonging to persons residing in different states may be determined in every case; but it is well settled that a vessel cannot have more than one home port, or be a domestic vessel in more than one state. *A fortiori* she may, if owned by residents of different states, be a foreign vessel in the port of a state wherein certain of her owners reside. *Prima facie*, the home port is the place of enrollment, where or nearest to which the owner, or, if more than one owner, the managing owner, resides. *The Jennie B. Gilkey*, 19 Fed. Rep. 127, cited and approved.

2. SAME—PROVISIONS FOR CREW—DISBURSEMENTS.

Persons supplying provisions for the crew, and those advancing money to pay the claims of material-men, may look to the vessel for payment, if the transactions have taken place away from her home port, and at the request of her master, unless it can be shown that the master was without authority, and that the parties had knowledge of such a want of authority.

3. SAME—CREDIT—BILL OF SALE AS SECURITY.

The personal security of the master does not relieve the vessel or her owners from liability, nor does the holding of bills of sale absolute on their face preclude the material-man from attaching the vessel, if it can be shown, by clear and positive proof, that they were intended to be held as collateral security.

4. SAME—INTEREST AND COSTS.

If the court is not satisfied that the libelants have acted with absolute good faith, neither interest nor costs will be allowed.

In Admiralty. Proceedings *in rem* by material-men.

*J. B. Leavitt*, for libelants.

*Wm. M. Lanning*, for respondent.

WALES, J. The libelants sue to recover the balance of their account against the schooner Ellen Holgate for chandlery, stores and disbursements supplied to and made on the credit of the vessel, from November 14, 1884, to September 22, 1885, while she was lying at Jersey City, in this district, or in the port of New York. There is no allegation in the libel, nor is there any evidence to show, what articles were furnished at either place, in quantity, quality, or value; and, as the vessel was owned both in New Jersey and in New York, it is insisted by the respondent (1) that the libelants have no lien under the general maritime law, because the vessel was a domestic one in both states; (2) that, the the libelants having failed to comply with the requirements of the New York statute, they have no lien under the local law for articles furnished in that state; and (3) that the lien given by the law of New Jersey cannot be enforced for want of certainty as to the description or value of the articles furnished while the vessel was lying at Jersey City.

During the year 1884–85 the schooner sailed between Virginia and

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

New York. She was enrolled at Philadelphia, and owned in Pennsylvania, New Jersey and New York. John A. J. Sheets, who resided at Haddonfield, New Jersey, and had an office for the transaction of business in Philadelphia, was her managing owner, and had been such for several years. It is difficult to formulate a precise rule by which the home port of a vessel, belonging to persons residing in different states may be determined, in every case, where the question of lien under the general or a local law may be involved. Some general directions may be drawn from the act of congress relating to the registration of vessels, (section 4141, Rev. St.,) and from adjudged cases. *Prima facie*, the home port is the place of enrollment, where or nearest to which the owner, or, if more than one, the managing owner, resides; and that continues to be the home port until another has been established by a change of the place of enrollment, or by a change of the owner's residence. But the authorities do not support the theory that a vessel can have more than one home port, or be a domestic vessel in more than one state, at the same time. *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 596; *Morgan* v. *Parham*, 16 Wall. 471; *The Superior*, Newb. Adm. 176; *The Indiana*, Crabbe, 479; *The St. Lawrence*, 3 Ware, 211; *The E. A. Barnard*, 2 Fed. Rep. 712; *The Mary Chilton*, 4 Fed. Rep. 847; *The Albany*, 4 Dill. 439; *The Red Wing*, 14 Fed. Rep. 869; *The C. Vanderbilt*, 19 Fed. Rep. 219; *The Thomas Fletcher*, 24 Fed. Rep. 375; *The Lotus No. 2*, 26 Fed. Rep. 637; *The Mary Morgan*, 28 Fed. Rep. 196.

Most directly in point is *The Jennie B. Gilkey*, 19 Fed. Rep. 127. In that case supplies were furnished, in New York, to a vessel which was owned in Maine, New Hampshire, and Massachusetts, excepting that a 1-64 part was owned by a New York firm who acted merely as brokers and consignees of the vessel, but neither had nor assumed to have any of the powers of managing owners. The vessel was largely owned in Boston, had a permanent register in that port, and her managing owner resided there. It was held by Judge LOWELL that the Gilkey was a foreign vessel in New York, though that port was for the most part her head-quarters.

For the purposes of the present case it is sufficient to decide that the Holgate was in a foreign port at New York; and, this being so, it becomes immaterial to ascertain whether she was foreign or domestic in New Jersey, since, if a foreign vessel, the libelants would have a lien under the general law, or, if a domestic vessel, they would have a lien under the local law, for the supplies furnished in the latter state.

Another branch of the defense is that the items for provisions and disbursements, in the account, were not properly chargeable to the vessel. The master sailed the schooner, under an agreement with the managing owner, on the usual half share; that is, after deducting the port charges from the gross earnings of freight, the remainder is equally divided between the owners and the master, the former being liable for chandlery and repairs, and the latter for the seamen's wages and the food bills. The charges for groceries and provisions are objected to on the ground that the libelants knew of the agreement between the managing owner

and the master, and therefore knew that the latter had no authority to order provisions on the credit of the vessel. There is a want of direct and satisfactory proof that the libelants had notice of this agreement, and their disclaimer of knowledge of it must be accepted as true. Provisions for the crew of a vessel are quite as necessary as repairs and rigging to enable her to prosecute her voyage, and for such supplies, in a foreign port, the ship-chandler or merchant is entitled to a lien when acting in good faith with the owners.

The objection to the disbursements is equally untenable. The schooner being in debt for spars, rigging, and repairs, the libelants advanced money to the master to pay the claims of material-men, and prevent a threatened attachment. That the master gave his personal security for the repayment of some of these advances did not relieve the vessel or her owners from liability for them. Money lent for such purposes becomes a lien of equal grade with the debt for the payment of which it was borrowed. It is only necessary that the debt should be a maritime lien under the general or the local law. *The Guiding Star*, 9 Fed. Rep. 521; *The Lulu*, 10 Wall. 192; *The Emily Souder*, 17 Wall. 666; *The St. Lawrence*, 3 Ware, 211; *The Nestor*, 1 Sum. 75.

The fact that the libelants held two bills of sale, absolute on their face, each for a 1-64 share of the Holgate, is not of itself so conclusive of ownership as to deprive them of the right, as material-men, to libel her. Whether, under any state of facts, an owner can libel his own vessel, is not the question here; for there is clear and positive proof that the bills of sale which were delivered to the libelants were intended to be held by them as collateral security for the repayment of borrowed money. They were virtually chattel mortgages, designed to be such, and nothing more; and the libelants enjoyed none of the profits, and exercised none of the rights, of ownership. It has frequently been held that an absolute deed, delivered and intended merely as a security for the payment of a debt, is a mortgage. *Hughes* v. *Edwards*, 9 Wheat. 489; *Peugh* v. *Davis*, 96 U. S. 332; *Russell* v. *Southard*, 12 How. 139; *Babcock* v. *Wyman*, 19 How. 289.

The libelants had a running account against the schooner, which was kept in the usual manner, with the debits and credits entered on the opposite sides of their ledger. The items were entered at the times when the supplies were ordered and delivered, and the money disbursed. Credits were entered whenever the master made a cash payment. A few days before the libelants began this action, Mr. Sheets called at their office, in New York, and asked for their bills against the schooner. He did not receive them at once; but, when they were handed to him, he discovered the absence of any credits, and, knowing that payments had been made by the master, requested an explanation. He was promised a further statement, but did not get one. Shortly afterwards he received from libelants the following telegram: "Unless you wire me by one o'clock to-day three hundred ninety dollars sixty-one cents, less expense of telegraphing, will libel schr. Holgate." To this he made no reply, and the libel was filed on the second of November, in less than two days

after the date of the telegram. The explanation subsequently made before the commissioner by the libelants, that the payments made by the master had been applied to the charges for groceries and provisions, which charges were not included in the bills handed to Mr. Sheets, affords no excuse for keeping back any part of the account as it originally stood on their ledger. Mr. Sheets, as managing owner, was entitled to a full statement of the account, and the libelants had no right to withhold any part of it; nor had they any right to appropriate the cash payments in any other way than as they appear on the ledger when they were first entered.

It is contended by the libelants that there was an express understanding between them and the master that all the payments made by him should be credited to the charges for provisions; that the credits were in fact intended to be so applied from the beginning of the account; and that it was by a mistake in book-keeping that they appear otherwise. The explanation is not satisfactory. The ledger account, with its original entries, fixes the appropriations of payments; and it was not permissible, after this libel had been filed, for the libelants to undertake to open new accounts, and classify the different charges, in order to apply all the cash payments to the account for stores. The original account cannot be thus altered, to suit a private arrangement between libelants and the master, to the prejudice or injury of the respondent.

That libelants acted under the advice of counsel may palliate, but does not justify, such an undertaking. Mr. Sheets properly refused to comply with the peremptory demand to pay libelants' bills, without further explanation, at the time the telegram was received, and the respondent should not, therefore, be compelled to pay any larger sum than was actually due on the day the libel was filed. The demand by telegram was in excess of this amount. By deducting the credits from the debits as they appear in the original account, the balance due is $375.27, for which a decree may be entered for the libelants; but, for reasons already indicated, and because I am not satisfied that the libelants and the master, in their dealings together, acted in entire good faith towards the respondent, no interests or costs will be allowed.