**Petition of WITT.**

**No. 505140.**

United States District Court,
E. D. New York.

Feb. 23, 1954.

Harry Addelson, U. S. Naturalization Examiner, Brooklyn.

Amy Wren, Brooklyn, for petitioner.

BYERS, D. J.

Opposition to this petition for naturalization is based by the Government on the theory that Reidar Witt, the petitioner, has failed to bring himself within the provisions of Section 330(a)(1), Immigration and Nationality Act, 8 U.S.C.A. § 1441(a) (1), in that the vessels upon which he served as master were not those "whose home port is in the United States, and * * * or (ii) the full legal and equitable title to which is in * * * a corporation organized under the laws of any of the several States of the United States * * *."

The periods of service are conceded, namely about six years two months and twenty-five days, between May 24, 1943 and June 10, 1946, September 23, 1948 to September 13, 1950, and April 23, 1951 to April 5, 1953; also the good conduct is unquestioned. The petitioner holds a Norwegian master's license and for all that appears in the record to the contrary, is in every personal respect qualified for citizenship.

The difficulty has to do with service on the S. S. Sideling Hill, between September 23, 1948 and September 13, 1950, and on the S. S. Caltex Capetown, from April 23, 1951 to April 5, 1953.

The title of these vessels is in Overseas Tankship Corporation, a corporation of the Republic of Panama, the stock of which is jointly owned by the Standard Oil Company and the Texas Company, both of which are Delaware corporations.

For present purposes it is deemed that legal title to these vessels is in corporations organized under the laws of one of the States of the Union. The contention is made, however, that these vessels were engaged exclusively in foreign trade and that they called at ports in the United States only on rare occasions and seem not to have taken nor discharged cargoes therein.

The petitioner's testimony given before the designated Examiner disclosed that the Sideling Hill, on which he served as above stated, was engaged in carrying oil to Formosa and Far Eastern ports, and that he joined the ship in San Francisco, having been hired in New York; that the ship did not return to the United States between September 8, 1948 and September 19, 1950; also that he was discharged on September 13, 1950 in Persia and was flown to this country on a two months' vacation, after which he again signed in New York on April 11, 1951 to serve

on the Caltex Capetown and that his discharge occurred in Persia on April 5, 1952 and he was again flown back to the United States and was paid for a two months' vacation.

That he never applied for permission to the Attorney General to be absent from the United States for a period of over one year in the development of foreign trade; that he merely took ordinary re-entry permits and got them extended from time to time. There seems to be no contention that the service in which both ships were engaged was not the same, i. e., foreign commerce between foreign ports.

On behalf of the corporate owners a letter was written to the Immigration and Naturalization Service, touching this petitioner, in which it was stated that the official home port of registry of both vessels was Panama City, Republic of Panama, and that the primary function of the operating corporation was to transport petroleum and petroleum products in foreign commerce; that its operations consist almost exclusively "of traveling between foreign ports and its vessels touch the United States only on infrequent occasions. * * * vessels usually return to Bahrain, Persian Gulf, on the completion of each voyage. Consequently, if * * * vessels have a 'home port' other than their official home port of registry at Panama City, Panama, it would be in the Persian Gulf. * * * Repairs to * * * vessels are accomplished at established repair facilities throughout the world, including on occasion the United States, depending on, among other considerations, the nature and magnitude of the repairs, the location and operating schedules of the vessels, and the availability of the repair facilities."

At the hearing in court, testimony was taken for and on behalf of the petitioner which did not develop any facts at variance with the foregoing quotation. Additionally it appeared, however, that operating instructions concerning the movements of these ships were issued from the New York office maintained by the corporate owner and each ship was at all times in touch with that New York office for that purpose.

In the brief filed for the petitioner, the following appears:

"The applicant claims the home port to be New York City, where its (the corporate owner) main office is, where all orders to captains of ships are issued daily, where messages are sent daily from every ship, where contracts with applicant for his services were signed, where he was hired and discharged, and where he was paid off in United States money."

Apparently the foregoing distinguishes between the discharge from the ship, which occurred in the Persian Gulf, and the payment for services, made in New York.

Even if there were one or two stops at United States ports by either of these ships during the above-named periods, such stops were fortuitous and do not affect the nature of business in which the ships were engaged.

Reliance is had for the petitioner on the cases of United States v. Camean, 2 Cir., 174 F.2d 151, and Application of Aguirre, D.C., 90 F.Supp. 668. Those dealt with ships registered and ostensibly owned by foreign corporations which were actually the property of corporations of the United States, and the vessels upon which the respective petitioners served plied regularly between ports of the United States and foreign ports; for the purpose of the naturalization statutes, it was held in both cases that the home ports of those vessels were in the United States, and therefore that the applicants were eligible for citizenship.

Concededly the legal difficulty exists because of the employment of the term "home port" in the Nationality Act of 1952. Seemingly in each of the cases

cited, the courts recognized the effort on the part of the Congress to favor seamen who serve on vessels of essentially United States ownership which operated under foreign flags for purely practical reasons; thus the term "home port" has been construed in favor of the seamen, somewhat at the expense of maritime concepts having to do with vessels, that is their documentation and the creation of liens enforcible against them. U.S.C.A. Tit. 46, § 18, and § 911, et seq.

The term "home port" has been discussed, for instance, in White's Bank of Buffalo v. Smith, 7 Wall. 646, 74 U.S. 646, 19 L.Ed. 211 and in The Ellen Holgate, D.C., 30 F. 125, and the meaning to be ascribed to the word "port" is interestingly discussed in Hamburg-American Steam Packet Co. v. U. S., 2 Cir., 250 F. 747 at pages 759–764.

In the latter case and in quite another context, the language is at page 764 of 250 F.:

> " * * * the word 'port' is a somewhat indefinite term; that its meaning is not exact, but depends upon the connection in which it is used; that it has been employed to designate a place where ships are accustomed to load and unload goods, or to take on and let off passengers, and where persons and merchandise are allowed to pass into and out of the realm."

However desirable it may be to construe the words "home port" in the instant statute in favor of seamen engaged in regular maritime service between foreign and United States ports, I cannot believe that such a benevolent construction was intended by Congress to apply to one who has been engaged entirely in foreign commerce between foreign ports, and under such circumstances at least, the words "home port" in the statute cannot be tacitly ignored so as to justify the granting of this petition; therefore it must be denied.